JUDGE HOLWELL

**11 CIV 5209**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** )<br>)<br>) | Civil Action No.: |
| **Plaintiff,** ) | |
| **vs.** ) | |
| **HIGHLAND STONE CAPITAL MANAGEMENT, L.L.C., FOREX CAPITAL TRADING GROUP, INC., FOREX CAPITAL TRADING PARTNERS, INC., JOSEPH BURGOS, SUSAN G. DAVIS and DAVID E. HOWARD II,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | RECEIVED<br>JUL 27 2011<br>U.S.D.C. S.D. N.Y.<br>CASHIERS |
| **Defendants.** ) | |

### COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Plaintiff, the United States Commodity Futures Trading Commission (the "Commission" or "CFTC"), by its attorneys, alleges as follows:

### I.   SUMMARY

1.      Beginning in at least April 2009, and continuing through the present ("relevant time"), the Defendants, Highland Stone Capital Management, LLC ("Highland Stone" or "Highland"), Forex Capital Trading Group, Inc. ("Forex Group"), Forex Capital Trading Partners, Inc. ("Forex Partners"), by and through their agents and employees, including but not limited to, Joseph Burgos ("Burgos"), Susan G. Davis ("Davis") and David E. Howard II ("Howard") began to solicit members of the public to open foreign currency ("forex") accounts which they would manage.  Forex Group, Forex

Partners and/or Highland Stone introduced accounts for at least 73 customers who invested more than $1.3 million. From May 2009 through October 2010, the customers suffered $961,065 in trading losses and lost the majority of their net deposits in an average of 3.4 months after opening their individual accounts.

2.     Each of the Defendants uses misrepresentations to solicit potential and existing forex customers. The misrepresentations include: (a) making false statements claiming incredible profits spanning several years on their websites and elsewhere; (b) falsified account statements of Highland's proprietary trading to prospective customers that purport to show verified past profitable results for managed accounts; and (c) giving false assurances to customers that Burgos' alleged successful past experience, coupled with careful management by Burgos, Davis and Howard, will minimize risk. In fact, the Defendants lost and continue to lose over 86% of their customers' managed funds, and between May 2009 and October 2010, customers experienced losses in 78% of the months that the Defendants traded their accounts.

3.     On October 18, 2010, the CFTC adopted new regulations implementing certain provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010) ("Dodd-Frank Act"), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), and the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), to be codified at 7 U.S.C. §§ 1 *et seq.*, with respect to off-exchange foreign currency ("forex") transactions. Pursuant to Section

2(c)(2)(C)(iii)(I)(aa), (bb) of the Commodity Exchange Act ("the Act"), as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), (bb), an entity must be registered if it solicits or accepts orders from a non-Eligible Contract Participant ("ECP") in connection with forex transactions at a retail foreign exchange dealer ("RFED") or futures commission merchant, or if it exercises discretionary trading authority over any account for or behalf of a non-ECP in connection with transactions at an RFED or futures commission merchant.

4.     Pursuant to CFTC Regulation ("Regulation") 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i) (2011), in connection with retail forex transactions all commodity trading advisors must have been registered with the CFTC by October 18, 2010.

5.     Beginning on October 18, 2010 and continuing to the present, Forex Group, Forex Partners and Highland while acting as commodity trading advisors ("CTA") exercised discretionary trading authority over the accounts of non-ECPs in connection with forex transactions in violation of Section 2(c)(2)(C)(iii)(I)(bb) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(bb), and Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i) (2011).

6.     Pursuant to Regulation 5.3(a)(3)(ii), 17 C.F.R. § 5.3(a)(3)(ii) (2011), in connection with retail forex transactions all associated persons ("APs") of a commodity trading advisor must have been registered with the CFTC by October 18, 2010.

7.     Beginning on October 18, 2010 and continuing to the present, Burgos, Davis and Howard while acting as APs of CTAs solicited non-ECPs in connection with forex transactions without benefit of registration in violation of Section

2(c)(2)(C)(iii)(I)(aa) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(3)(ii), 17 C.F.R. § 5.3(a)(3)(ii) (2011).

8.      Pursuant to Regulation 5.3(a)(5)(i), to be codified at 17 C.F.R. § 5.3(a)(5)(i) (2011), in connection with retail forex transactions all introducing brokers ("IBs") must have been registered with the CFTC by October 18, 2010.

9.      Beginning on October 18, 2010 and continuing to the present, Forex Group and Forex Partners, while acting as IBs, solicited and accepted orders for non-ECPs in connection with forex transactions in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(5)(i), 17 C.F.R. § 5.3(a)(5)(i) (2011).

10.     Pursuant to Regulation 5.3(a)(5)(ii), 17 C.F.R. § 5.3(a)(5)(ii) (2011), in connection with retail forex transactions all APs of IBs must have been registered with the CFTC by October 18, 2010.

11.     Beginning on October 18, 2010 and continuing to the present, Davis and Howard while acting as APs of IBs solicited and accepted orders for non-ECPs in connection with forex transactions in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(5)(ii), 17 C.F.R. § 5.3(a)(5)(ii)(2011).

12.     By virtue of this conduct and the conduct further described herein, from April 2009 to the present, Defendants have engaged, are engaging, or are about to engage

in acts and practices in violation of the Act, as amended by the CRA, and the Regulations.

13      Accordingly, pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, and Section 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act, as amended, and to further enjoin Defendants from engaging in certain commodity and forex-related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

14.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.      JURISDICTION AND VENUE

15.      Section 6c(a) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

16.      The Commission has jurisdiction over the forex transactions at issue in this case pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-

1, and Section 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2).

17.     Venue properly lies with the Court pursuant to Section 6c(e) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(e), because Defendants transacted business in the Southern District of New York and certain of the transactions, acts, practices, and courses of business alleged occurred, are occurring, and/or are about to occur within this District.

### III.     PARTIES

18.     Plaintiff, **Commodity Futures Trading Commission**, is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, as amended, to be codified at 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.*

19.     Defendant **Highland Stone Capital Management, LLC** is a New Jersey Limited Liability Company registered on April 25, 2006.  Highland has conducted business at 50 Broad Street and 75 Broad Street, New York, New York.  Its registered office is 31 E. Erie Ave., Rutherford, New Jersey.  Highland has never been registered in any capacity with the CFTC.

20.     The **Forex Capital Common Enterprise Defendants** consists of two domestic companies, identified below, that are controlled by Davis and Howard, share an office, overlap their identities in dealings with others, and commingle commission funds related to customer investment accounts.  In substance, there is no meaningful distinction

between the entities, which operate as a common enterprise and are collectively referred to as the "**Forex Capital Entities**."

      a. Defendant **Forex Capital Trading Group, Inc.** is an active New York corporation created on May 1, 2009.  Its registered address is 408 Bemet Ave, Staten Island, New York, but it has also done business at 130 Williams Street, 6th Floor, New York, New York.  Forex Group has never been registered in any capacity with the CFTC.

      b. Defendant **Forex Capital Trading Partners, Inc.** is an active New York corporation that was created on June 15, 2009.  Its registered address is 130 Williams Street, New York, New York.  Forex Partner's principal business address during most of the relevant time was 50 Broad Street, Suite 1437, New York, New York.  It may have done business at 75 Broad Street, New York, New York and is presently located at 44 Wall Street, 16th Floor, Ste. 1601, New York, New York.  Forex Partners has never been registered in any capacity with the CFTC.

21.    Defendant **Joe Burgos** currently resides in Rutherford, New Jersey. Burgos is the managing member and registered agent for Highland and held himself out to the public as such.  At all material times, Burgos controlled Highland's bank and trading accounts.  Burgos has never been registered in any capacity with the CFTC.

22.    Defendant **Susan G. Davis**, also known as Susan M. Davis, resides in Jersey City, New Jersey and Saint Petersburg, Florida.  Davis is the president and secretary of Forex Partners, the company's registered agent and owns 50% of its stock.

At all material times, Davis controlled the Forex Capital Entities' bank accounts. Davis also holds herself out to the public as a "partner" and president of Forex Group and as a controlling person of the Forex Capital Entities. Davis is the principal, and became registered as an AP, of a new CTA, Forex Capital Trading Partners, NA, Inc., on May 31, 2011. She has never been registered in any other capacity with the CFTC.

23.     Defendant **David E. Howard II** currently resides in Woodstock, Georgia and may also have a residence in New York, New York. Howard is the chief executive officer of Forex Partners and owns 50% of its stock. Howard has full authority to make financial transactions on behalf of Forex Partners. Howard held himself out to the public as a controlling person of Forex Partners and Forex Group, the latter being a common enterprise with Forex Partners. Howard has never been registered in any capacity with the CFTC.

## IV.   FACTS

### A.   Statutory Background

24.     An ECP is generally defined in Section 1a(12)(A)(xi) of the Act, as amended, to be codified at 7 U.S.C. § 1a(12)(A)(xi), as an individual who has total assets in an amount in excess of (i) $10 million or (ii) $5 million and who enters into the transaction to manage risk.

25.     A retail forex customer ("RFC") is defined in Section 5.1(k) of the Regulations, 17 C.F.R. § 5.1(k) (2011), as a person, other than an ECP, acting on its own behalf and trading forex.

8

26.     The term CTA is defined, in relevant part, in Section 5.1(e)(1) of the Regulations, 17 C.F.R. § 5.1(e)(1) (2011), as any person who "exercises discretionary trading authority or obtains written authorization to exercise discretionary trading authority" over any account for or on behalf of any person that is not an eligible contract participant, in connection with retail forex transactions.

27.     The term AP of a CTA is defined, in relevant part, in Section 5.1(e)(2) of the Regulations, 17 C.F.R. § 5.1(e)(2) (2011), as any natural person associated with a CTA as a partner, officer, employee, consultant or agent in any capacity which involves "the solicitation of a client's or prospective client's discretionary account."

28.     The term IB is defined, in relevant part, in Section 5.1(f)(1) of the Regulations, 17 C.F.R. § 5.1(f)(1) (2011), as any person who solicits or accepts orders from a customer that is not an eligible contract participant, in connection with retail forex transactions.

29.     The term AP of an IB is defined, in relevant part, in Section 5.1(f)(2) of the Regulations, 17 C.F.R. § 5.1(f)(2) (2011), as any natural person associated with an IB as a partner, officer, employee, or agent in any capacity which involves "[t]he solicitation or acceptance of retail forex customers' orders."

**B.     Highland and the Forex Capital Entities Agree to Solicit Public Customers to Trade Forex Through Managed Accounts**

30.     In 2005, Burgos began trading forex in personal trading accounts for himself and in 2008 opened trading accounts for his firm, Highland, as its "Managing Partner." Between February 2005 and March 2010, through eighteen different trading accounts at two different foreign forex brokers that Burgos opened in his name or

Highland's, he lost the sum of $56,665, which constituted 98% of his trading accounts' net deposits.

31.    Despite this unsuccessful past forex trading experience by Burgos for his proprietary accounts, during the relevant time, Davis, Howard and Burgos told managed account customers that Burgos would manage their accounts.  However, the Forex Capital Entities were also involved in managing customer accounts, which were traded through the two foreign forex brokers.

32.    On April 29, 2009, Davis, on behalf of Forex Group, entered into an agreement with City Credit Capital (UK), Ltd. ("CCC"), a forex broker located in the United Kingdom, that began acting in the capacity of an RFED after October 18, 2010 to introduce retail forex accounts to CCC in exchange for compensation in the form of per trade rebates, mark-ups and commissions.

33.    On June 14, 2010, Davis and Howard, on behalf of Forex Partners, entered into an agreement with Windsor Brokers, Ltd. ("Windsor"), a forex broker located in Cyprus, that began acting in the capacity of an RFED after October 18, 2010, to introduce retail forex accounts to Windsor in exchange for compensation in the form of per trade rebates, mark-ups and commissions.

**C.    Highland, the Forex Capital Entities, Burgos, Davis and Howard Solicited Managed Account Customers**

34.    The Forex Capital Entities, Highland, Burgos, Davis and Howard solicited customers in person, by cold telephone call or email and through the Forex Capital Entities and Highland websites to open accounts at CCC or Windsor.

35.     The Forex Capital Entities, Highland, Burgos, Davis and Howard thereby solicited potential United States customers who are not ECPs to open margined forex trading accounts with CCC or Windsor acting as the counterparty to their transactions.

36.     Through these means, the Forex Capital Entities, Highland, Burgos, Davis and Howard successfully solicited and accepted orders from 73 retail forex customers who invested at least $1.3 million with the Forex Capital Entities.  Nearly half of the Forex Capital Entities' customers were elderly and nearly all of them were from the United States.

37.     Through their websites, and from October 18, 2010 to the present, the Forex Capital Entities, Highland, Burgos, Davis and Howard solicit orders from United States customers who are not ECPs in connection with margined retail forex transactions with CCC or Windsor acting as the counterparty to U.S. customers.

38.     On information and belief, neither CCC or Windsor, each of whom was acting in the capacity of an RFED, nor the Forex Capital Entities, Highland, Burgos, Davis or Howard, is a financial institution, registered broker dealer, insurance company, futures commission merchant, financial holding company, or investment bank holding company or an AP of any such entity.

39.     On information and belief, and from October 18, 2010 to the present, the retail forex transactions CCC and Windsor engage in with non-ECP United States customers after those customers are solicited to make those transactions by the Forex Capital Entities, Highland, Burgos, Davis and Howard, neither result in delivery within two days nor create an enforceable obligation to deliver between a seller and a buyer who

have the ability to deliver and accept delivery, respectively, in connection with their lines of business. Rather, these retail forex transactions remain open from day to day and ultimately are offset without anyone making or taking delivery of actual currency (or facing an obligation to do so).

40.     Between May 2009 and October 2010, Forex Group earned more than $285,000 in fees for introducing customer accounts to CCC. CCC paid some of these commissions to Forex Partners.

41.     Between July 2010 and October 2010, Forex Partners earned more than $35,000 in fees for introducing customer accounts to Windsor.

42.     On information and belief, the Forex Capital Entities paid Highland for its role in managing customer accounts.

43.     By the date of filing of this complaint, the Forex Capital Entities, Highland, Burgos, Davis and Howard had not registered with the Commission as a CTA, an AP of Highland and the Forex Capital Entities, an IB or an AP of an IB. Furthermore, the Forex Capital Entities, Highland, Burgos, Davis and Howard are not exempt from registration by virtue of CCC or Windsor meeting any of the descriptions in sub-paragraph (aa), (bb), (cc), (dd), (ee), or (ff) of Section 2(c)(2)(B)(i)(II) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §2(c)(2)(B)(i)(II).

**D.     Customers' Trading Losses were Extensive**

44.     The Forex Capital Entities' customers lost a significant portion of their investment principal soon after they commenced trading through their accounts at CCC

or Windsor.  Between May 2009 and October 2010, at least 73 customers invested a total of $1,316,789, and lost $961,065 through trading in their accounts.

45.     In the end, customers lost an aggregate percentage of more than 86% of their overall invested principal amount through forex trading.

46.     During the same 18-month period, from May 2009 until October 2010, customers' accounts had losses in 78% of the months in which trading took place.

E.     **Defendants Repeatedly Touted False Performance Profits and Low Risk**

47.     Davis, Howard and Burgos, through their firms' respective websites, distributed an identical chart showing a track record of high performance yields for managed accounts for the period from 2004 to 2010 ("Performance Chart") to entice prospective customers to invest in a Forex Capital Entities managed account.  Their Performance Chart is false and does not reflect the actual trading activity during those years.  Only Highland and Burgos, among the Defendants, had proprietary trading accounts, and, with the exception of 2006, Highland's and Burgos' proprietary accounts lost substantial sums every year that they traded, namely from 2005 until 2009, and did not even trade during 2004.  None of the Defendants managed customer accounts until mid-2009, and, overall, those managed customer accounts suffered losses through October 2010.

48.     For instance, in 2009, the Forex Capital Entities' managed customer accounts lost a combined sum of $224,824, but they reported a 149.35% positive rate of return for that calendar year.  Similarly, through October 2010, Forex Capital Entities' customers lost a total of $736,241, while the Defendants reported gains of 51.94% for the

calendar year.  Even in 2006, the Highland and Burgos proprietary trading accounts lost
money in six different months; while the Defendants reported profitable monthly rates of
return in those same months for alleged "managed" accounts.

49.     Defendants' Performance Chart shows specific monthly rates of return for
their managed account customers which are also discredited by the actual monthly rates
of return experienced by their managed account customers.  For instance:

a)      In May 2009, Defendants reported a gain of 27.09% for their managed
account customers for the month and Defendants' managed account
customers actually experienced a loss of at least 17.25% for the month;

b)      In October 2009, Defendants reported a loss of 2.97% for the month and
Defendants' managed account customers actually experienced a loss of at
least 42.81% for the month;

c)      In February 2010, Defendants reported a loss of 9.30% for the month and
Defendants' managed account customers actually experienced a loss of at
least 47.16% for the month; and

d)      In April 2010, Defendants reported a profit of 10.24% for the month and
Defendants' managed account customers actually experienced a profit of
only 5.94% for the month.

50.     The Forex Capital Entities sent the false Performance Chart to customers
and the Forex Capital Entities and Highland published and continue to publish these same
purported results on their respective websites and other marketing sites.

51.    In September 2010, Burgos submitted the same false Performance Chart of trading results on behalf of Highland to a firm that sells published data to the financial industry.  That firm removed the Highland data from its website because the results seemed too incredible and because Burgos and Forex Partners were unable to provide an auditor's report verifying these purported results.  In fact, in an unsuccessful attempt to fabricate a verification, Highland faxed a so-called "Independent Auditor's Report" to that firm attempting to confirm such results.

52.    The Forex Capital Entities falsified Highland proprietary account statements showing profitable trading and gave an alleged "verification" of those statements from the RFED to prospective customers to convince them of the Forex Capital Entities' past success in managing forex trading for customers.  At least one prospective customer received false statements for purported Highland accounts showing profits that were from demo accounts and not actual funded trading accounts.

53.    Davis, Howard and Burgos also told prospective customers that Burgos was an experienced and successful forex trader and that Davis, Howard and Burgos would together carefully manage the customers' accounts in order to reduce the risks of forex trading.

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

#### Violations of Sections 4b(a)(2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Fraud in Connection with Forex) (All Defendants)

54.     The allegations set forth in paragraphs 1 through 53 are realleged and incorporated herein by reference.

55.     Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C), make it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery … that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

Sections 4b(a)(2)(A)-(C) of the Act, as amended, apply to Defendants' foreign currency transactions, agreements or contracts offered by Defendants.

56.     As set forth above, from at least April 2009, through the present, in or in connection with foreign currency contracts, made, or to be made, for or on behalf of other persons, Highland Stone by and through Burgos and the Forex Capital Entities by and through their agents and employees, including but not limited to, Davis and Howard,

cheated or defrauded, or attempted to cheat or defraud, customers or prospective customers and willfully deceived or attempted to deceive customers or prospective customers by, among other things, knowingly: fraudulently soliciting customers and prospective forex customers in violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

57.     Highland Stone by and through Burgos and the Forex Capital Entities by and through their agents and employees, including but not limited to Davis and Howard, engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

58.     Burgos controlled Highland, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Highland's conduct alleged in this Count. Therefore, pursuant to Section 13(b) of the Act, as amended, to be codified at 7 U.S.C. § 13c(b), Burgos is liable for Highland's violations of Sections 4b(a)(2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

59.     The foregoing acts, misrepresentations and omissions of Burgos occurred within the scope of his employment, office or agency with Highland. Therefore, Highland is liable for these acts pursuant to Section 2(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2011).

60.     Davis and Howard both controlled the Forex Capital Entities, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Forex Capital Entities' conduct alleged in this Count. Therefore, pursuant to Section 13(b) of the Act, as amended, to be codified at 7 U.S.C. § 13c(b), Davis and Howard are

liable for the Forex Capital Entities' violations of Sections 4b(a)(2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

61.    The foregoing acts, misrepresentations and omissions of Davis and Howard occurred within the scope of their employment, office or agency with the Forex Capital Entities. Therefore, the Forex Capital Entities are liable for these acts pursuant to Section 2(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2011).

62.    Each act of misrepresentation or omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

## COUNT II
### Violation of Section 2(c)(2)(C)(iii)(I)(bb) of the Act and Regulation 5.3(a)(3)(i)
### (Failure to Register as a Commodity Trading Advisor)
### (All Defendants)

63.    The allegations set forth in paragraphs 1 through 62 are realleged and incorporated herein by reference.

64.    The Forex Capital Entities and Highland are in the business of advising customers as to the advisability of retail forex trading and have managed and directed the retail forex trading on behalf of their customers. The Forex Capital Entities and Highland hold themselves out as commodity trading advisors to the public. By such conduct, the Forex Capital Entities and Highland acted as CTAs.

65.    The Forex Capital Entities' and Highland's customers were, with perhaps a few exceptions, individual customers or small corporate entities with limited asset

18

holdings far less than $10 million, and, as such, fell outside of the definition of an ECP as set forth in paragraph 24 above.

66.     From October 18, 2010 to the present, the Forex Capital Entities and Highland exercised discretionary trading authority over the accounts of non-ECPs, in connection with forex transactions in violation of Section 2(c)(2)(C)(iii)(I)(bb) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(bb), and Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3 (a)(3)(i) (2011).

67.     Davis and Howard control the Forex Capital Entities, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Forex Capital Entities conduct alleged in this Count; therefore, pursuant to Section 13(b) of the Act, as amended, to be codified at 7 U.S.C. § 13c(b), Davis and Howard are liable for the Forex Capital Entities' violations of  Section 2(c)(2)(C)(iii)(I)(bb) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(bb), and Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i) (2011).

68.     Burgos controls Highland, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Highland's conduct alleged in this Count; therefore, pursuant to Section 13c(b) of the Act, as amended, to be codified at 7 U.S.C. § 13(c)(b), Burgos is liable for Highland's violations of Section 2(c)(2)(C)(iii)(I)(bb) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(bb), and Regulation 5.3(a)(3)(i), 17 C.F.R. §5.3(a)(3)(i) (2011).

69.     Each day that the Forex Capital Entities and Highland failed to register as a CTA since October 18, 2010, is alleged as a separate and distinct violation of Section

2(c)(2)(C)(iii)(I)(bb) of the Act, as amended by the CRA, to be codified at 7 U.S.C.

§ 2(c)(2)(C)(iii)(I)(bb), and Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i) (2011).

### COUNT III

### Violations of Section 2(c)(2)(C)(iii)(I)(aa) of the Act and Regulation 5.3(a)(3)(ii)
### (Failure to Register as an Associated Person of a CTA)
### (All Defendants)

70.     The allegations set forth in paragraphs 1 through 69 are realleged and
incorporated herein by reference.

71.     From October 18, 2010 to the present, in soliciting persons for off-
exchange retail foreign currency trading on behalf of the Forex Capital Entities while
associated with the Forex Capital Entities, Davis and Howard acted as APs of the Forex
Capital Entities without the benefit of registration, in violation of Section
2(c)(2)(C)(iii)(I)(aa) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §
2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(3)(ii), 17 C.F.R. § 5.3(a)(3)(ii) (2011).

72.     The foregoing failure of Davis and Howard to register as APs occurred
within the scope of Davis's and Howard's employment or office with the Forex Capital
Entities.  The Forex Capital Entities are therefore liable for Davis' and Howard's acts and
failures in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended by the CRA,
to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(3)(ii) pursuant to
Section 2(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 2(a)(1)(B), and
Regulation 1.2, 17 C.F.R. § 1.2 (2011).

73.     From October 18, 2010 to the present, in soliciting persons for off-
exchange retail foreign currency trading on behalf of Highland while associated with

Highland, Burgos acted as an AP of Highland without the benefit of registration, in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(3)(ii), 17 C.F.R. § 5.3(a)(3)(ii) (2011).

74.     The foregoing failure of Burgos to register as an AP occurred within the scope of Burgos's employment or office with Highland.  Highland is therefore liable for Burgos' acts and failures in violation of Section 2(c)(2)(C)(iii)(I)(aa), as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and Regulation 5.3(a)(3)(ii), 17 C.F.R. § 5.3(a)(3)(ii) (2011), pursuant to Section 2(a)(1)(B) of the Act, as amended, to be codified at 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2011).

75.     Each day that Davis, Howard and Burgos failed to register as APs of a CTA since October 18, 2010, is alleged as a separate and distinct violation of Section 2(c)(2)(C)(iii)(I)(aa), as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(3)(ii), 17 C.F.R. § 5.3(a)(3)(ii) (2011).

### COUNT IV

**Violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act and Regulation 5.3(a)(5)(i)
(Failure to Register as an Introducing Broker)
(The Forex Capital Entities, Davis and Howard)**

76.     The allegations set forth in paragraphs 1 through 75 are realleged and incorporated herein by reference.

77.     The Forex Capital Entities are in the business of soliciting customers to invest in retail forex trading by arranging for them to open accounts at entities acting in the capacity of RFEDs.  By such conduct, the Forex Capital Entities acted as IBs.

78.     The Forex Capital Entities' customers were, with a possible few exceptions, individual customers or small corporate entities with limited asset holdings far less than $10 million, and, as such, fell outside of the definition of an ECP as set forth in paragraph 24 above.

79.     From October 18, 2010 to the present, the Forex Capital Entities solicited orders from non-ECPs in connection with forex transactions and acted as IBs, in violation of Section 2(c)(2)(C)(iii)(I)(aa), as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(3)(ii), 17 C.F.R. § 5.3(a)(5)(i) (2011).

80.     Davis and Howard control the Forex Capital Entities, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Forex Capital Entities' conduct alleged in this Count; therefore, pursuant to Section 13(b) of the Act, as amended, to be codified at 7 U.S.C. § 13(c)(b), Davis is liable for the Forex Capital Entities' violations of Section 2(c)(2)(C)(iii)(I)(aa), as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(5)(i), 17 C.F.R. § 5.3(a)(5)(i) (2011).

81.     Each day that the Forex Capital Entities failed to register as IBs since October 18, 2010, is alleged as a separate and distinct violation of Section 2(c)(2)(C)(iii)(I)(aa), as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(5)(i), 17 C.F.R. § 5.3(a)(5)(i) (2011).

<u>COUNT V</u>

<u>Violations of Section 2(c)(2)(C)(iii)(I)(aa) of the Act and Regulation 5.3(a)(5)(ii)</u>
<u>(Acting as an Unregistered Associated Person of an IB)</u>
<u>(The Forex Capital Entities, Davis and Howard)</u>

82.     The allegations set forth in paragraphs 1 through 81 are realleged and

incorporated herein by reference.

83.     From October 18, 2010 to the present, in soliciting persons for off-

exchange retail foreign currency trading on behalf of the Forex Capital Entities while

associated with the Forex Capital Entities, Davis and Howard acted as APs of the Forex

Capital Entities without the benefit of registration, in violation of Section

2(c)(2)(C)(iii)(I)(aa), as amended by the CRA, to be codified at 7 U.S.C.

§ 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(5)(ii), 17 C.F.R. § 5.3(a)(5)(ii) (2011).

84.     The foregoing failure of Davis and Howard to register as APs of the Forex

Capital Entities occurred within the scope of Davis' and Howard's employment or office

with the Forex Capital Entities.  The Forex Capital Entities are therefore liable for Davis'

and Howard's acts and failures in violation of Section 2(c)(2)(C)(iii)(I)(aa), as amended

by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Regulation

5.3(a)(5)(ii), 17 C.F.R. § 5.3(a)(5)(ii) (2011) pursuant to Section 2(a)(1)(B) of the Act, as

amended, to be codified at 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2

(2011).

85.     Each day that Davis and Howard failed to register as APs of the Forex

Capital Entities since October 18, 2010, is alleged as a separate and distinct violation of

Section 2(c)(2)(C)(iii)(I)(aa), as amended by the CRA, to be codified at 7 U.S.C.

§ 2(c)(2)(C)(iii)(I)(aa), and Regulation 5.3(a)(5)(ii), 17 C.F.R. § 5.3(a)(5)(ii) (2011).

## VI.   RELIEF REQUESTED

**WHEREFORE**, the CFTC respectfully requests that the Court, as authorized by

Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, and pursuant to its

own equitable powers enter:

A.      An order finding that the Defendants violated Sections 4b(a)(2)(A)-(C) of

the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C);

B.      An order finding that the Defendants violated Section

2(c)(2)(C)(iii)(I)(aa), (bb) of the Act, as amended by the CRA, to be codified at 7 U.S.C.

§ 2(c)(2)(C)(iii)(I)(aa), (bb) and Section 5.3(a)(3)(i) and (ii) of the Regulations, 17 C.F.R.

§§ 5.3(a)(3)(i) and (ii) (2011);

C.      An order finding that Defendants Forex Group, Forex Partners, Davis and

Howard violated Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended by the CRA, to be

codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and Sections 5.3(a)(5)(i) and (ii) of the

Regulations, 17 C.F.R.§§ 5.3(a)(5)(i) and (ii) (2011);

D.      An order of permanent injunction prohibiting the Defendants, and any of

their agents, servants, employees, assigns, attorneys, and persons in active concert or

participation with them, from engaging, directly or indirectly, in conduct in violation of

Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA and the Dodd-Frank Act, to

be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C);

E.       An order of permanent injunction prohibiting the Defendants, and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from engaging, directly or indirectly, in conduct in violation of Section 2(c)(2)(C)(iii)(I)(aa), (bb) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), (bb) and Sections 5.3(a)(3)(i) and (ii) of the Regulations, 17 C.F.R. §§ 5.3(a)(3)(i) and (ii) (2011);

F.       An order of permanent injunction prohibiting Defendants Forex Group, Forex Partners, Davis and Howard, and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from engaging, directly or indirectly, in conduct in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and Sections 5.3(a)(5)(i) and (ii) of the Regulations, 17 C.F.R. §§ 5.3(a)(5)(i) and (ii) (2011);

G.       An order of permanent injunction prohibiting Defendants, and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from:

1.       trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended, to be codified at 7 U.S.C. § 1a);

2.       entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2011)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of

the Act, as amended) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

      3.      having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

      4.      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

      5.      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

      6.      applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011);

      7.      acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)(2011)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011);

    H.      An order pursuant to Section 6c(a) of the Act restraining Defendants and all persons insofar as they are acting in the capacity of Defendants' agents, servants,

successors, employees, assigns, and attorneys, and all persons insofar as they are acting

in active concert or participation with them who receive actual notice of such order by

personal service or otherwise, from directly or indirectly:

1.      Destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants, wherever located, including all such records concerning Defendants' business operations;

2.      Refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of the Defendants, wherever located, including all such records concerning Defendants' business operations; and

3.      Withdrawing, transferring, removing, dissipating, concealing or disposing of, in any manner, any funds, assets, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account, whether domestic or foreign, held by, under the control, or in the name of the Defendants;

I.      An order directing that Defendants, and any successors thereof, provide

the Plaintiff immediate and continuing access to their books and records, make an

accounting to the Court of all of their assets and liabilities, together with all funds they

received from and paid to customers and other persons in connection with transactions

involving commodity futures, options on commodity futures, commodity options and/or

forex contracts, including the names, mailing addresses, email addresses and telephone

numbers of any such persons from whom they received such funds from January 1, 2008

to the date of such accounting, and all disbursements for any purpose whatsoever of

funds received from customers, including salaries, commissions, fees, loans and other

27

disbursements of money and property of any kind, from January 1, 2008 to and including the date of such accounting. At a minimum, the accounting should include a chronological schedule of all cash receipts and cash disbursements. In addition, each transaction shall be classified as business or personal. All business transactions shall disclose the business purpose of the transaction. The accounting shall be provided in an electronic format such as Quicken, Excel, or other accounting or electronic format spreadsheet. In addition, the Defendants shall supply true and accurate copies of any balance sheets, income statements, statement of cash flow, or statement of ownership equity previously prepared for the Defendants' business(es);

      J.     An order requiring Defendants immediately to identify and provide an accounting in the same manner as described above, for all assets and property that they currently maintain outside the United States, including, but not limited to, all funds on deposit in any financial institution, retail foreign exchange dealer, futures commission merchant, bank, or savings and loan accounts held by, under the control of, or in the name of Highland, Forex Partners, Forex Group, Burgos, Davis and Howard or their nominees, whether held jointly or otherwise, and requiring them to repatriate all funds held in such accounts by paying them to the Clerk of the Court, or as otherwise ordered by the Court, for further disposition in this case;

      K.     An order requiring Defendants, and any third party transferee and/or successors thereof, to disgorge, pursuant to such procedures as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from the acts or practices

which constitute violations of the Act and Regulations, as described herein, including pre- and post-judgment interest thereon from the date of such violations;

L.      An order requiring Defendants to make restitution by making whole each and every customer whose funds were received or utilized by them in violation of the provisions of the Act and Regulations as described herein, including pre- and post-judgment interest from the date of such violations;

M.      An order directing the Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices which constituted violations of the Act and Regulations, as described herein;

N.      Enter an order directing each Defendant to pay a civil monetary penalty in the amount of the higher of $140,000 for each violation of the Act committed on or after October 23, 2008; or triple the monetary gain to each Defendant for each violation of the Act described herein, plus post-judgment interest;

O.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

P.    Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

Date:  July 27, 2011                              Respectfully submitted,

                                        ATTORNEYS FOR PLAINTIFF
                                        U.S. COMMODITY FUTURES TRADING
                                        COMMISSION

                                        Janine M. Gargiulo [JG 6909]
                                        Michael P. Geiser [MG1123]
                                        Commodity Futures Trading Commission
                                        Division of Enforcement
                                        140 Broadway, 19th Floor
                                        New York, NY 10005
                                        (646)746-9700
                                        (646)746-9939(facsimile)
                                        jgargiulo@cftc.gov
                                        mgeiser@cftc.gov


                                        Lead Attorney, *pro hac vice* to be filed
                                        Susan B. Padove
                                        Senior Trial Attorney
                                        (312)596-0544
                                        spadove@cftc.gov

                                        Elizabeth Streit, *pro hac vice* to be filed
                                        Chief Trial Attorney
                                        (312) 596-0537
                                        estreit@cftc.gov

                                        Rosemary Hollinger, *pro hac vice* to be filed
                                        Regional Counsel
                                        rhollinger@cftc.gov

                                        U.S. Commodity Futures Trading Commission
                                        Division of Enforcement
                                        525 West Monroe Street, Suite 1100
                                        Chicago, Illinois 60661
                                        (312)596-0700 (Office Number)
                                        (312)596-0714 (facsimile)