UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

U.S. COMMODITY FUTURES TRADING   :
COMMISSION,   :
                       Plaintiff,   :
  :
         -v-   :
  :
HIGHLAND STONE CAPITAL   :
MANAGEMENT, L.L.C., et al.,   :
               Defendants. :
  :
----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **AUG 2 9 2013**

11 Civ. 5209 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      Plaintiff U.S. Commodity Futures Trading Commission ("CFTC") filed suit

against pro se defendants David Howard, Susan Davis, Joseph Burgos, and several

of their corporate entities on July 27, 2011, accusing them of fraudulently soliciting

retail investors to trade foreign currency ("forex") through accounts at retail foreign

exchange dealers ("RFEDs"). Those accounts were managed by two companies (the

"Forex Capital Entities") in which Davis and Howard were officers and directors,

Forex Capital Group ("Forex Group" or "FCG") and Forex Capital Trading Partners

("Forex Partners" or "FCP"). The Forex Capital Entities[1] used Burgos's company,

Highland Stone Capital Management LLC ("Highland") as their sole forex trader

from August 2009 through July 2011.

---

[1] At the preliminary injunction stage, the Court determined that FCP and FCG
operated as a common enterprise. (PI ¶ 7, ECF No. 136.) No new facts have been
presented to dispute this finding. The Court treats the Forex Capital Entities as a
single enterprise.

The CFTC alleges that Howard, Davis, and Burgos were never registered with the CFTC, in violation of provisions of the Commodities Exchange Act ("CEA") and Dodd-Frank Act effective October 2010, and that they intentionally or recklessly made material misstatements and omissions to disguise the fact that Burgos and Highland had a history of losing money in forex trading and continued to do so when trading for customers of the Forex Capital Entities.  In sum, the CFTC alleges that defendants' fraud resulted in 106 customers losing $2.86 million from August 2009 through July 2011.

Defendants Davis and Howard argue that they believed Burgos's representations of past forex trading success and were themselves victims of his misrepresentations and omissions.  Burgos states that the performance data on which Davis, Howard, and the investors relied was based on hypothetical, rather than actual, accounts – and that Davis and Howard knew or should have known that the accounts were hypothetical.

This Court issued a preliminary injunction against all defendants on February 9, 2012, following a four-day evidentiary hearing.  (ECF No. 70.) Defendants moved for partial reconsideration, and the Court modified the preliminary injunction on April 16, 2012.  (ECF No. 87.)

Now before the Court is the CFTC's motion for summary judgment as to all of its claims under the CEA against the individual defendants – Burgos, Howard, and Davis.  It further seeks a permanent injunction preventing defendants from

engaging in future forex trading, disgorgement of over $400,000 in account fees, and civil penalties.

While the Court finds that Burgos raises no issues of material fact as to the claims against him, triable issues remain with respect to certain claims against Davis and Howard, but not as to others.  For the reasons set forth below, the CFTC's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

The facts recited below are undisputed unless otherwise noted.  All favorable inferences are drawn in favor of the nonmovant, pro se defendants.

### a.  Factual Background

The evidentiary submissions in support of this motion are voluminous, encompassing the results of a wide-ranging CFTC investigation and the record of a four-day preliminary injunction hearing.  The Court recites only those undisputed facts necessary to understand the roles of the various parties here and their relevant conduct.

#### i.  Defendants and Related Entities

##### 1.  Forex Capital Trading Group, Inc. ("FCG")

Defaulting defendant FCG was a New York corporation that maintained an office at 130 Williams Street, New York, New York.  (Pl.'s 56.1 Reply ¶1, ECF No. 155.)  It was active at the time the CFTC filed this suit, but was never registered with the CFTC in any capacity.  (Pl.'s 56.1 ¶ 3, ECF No. 108.)

### 2.  Forex Capital Partners ("FCP")

Defaulting defendant FCP was a New York corporation whose registered address was the same 130 Williams Street address as FCG.  (Id. ¶ 2.)  Defendant Davis, President of FCP, states that FCP and FCG maintained separate office areas at the Williams Street address.  (Aff. of Susan Davis ¶ 1, (Defs. Howard and Davis Response to CFTC R. 56.1 Stmt of Material Facts ("Davis Howard 56.1") Ex. 29, ECF No. 137.)  FCP also did business at 50 Broad Street, 75 Broad Street, and 44 Wall Street.  (Id. ¶ 4.)  FCP was never registered with the CFTC in any capacity.  (Id.)

### 3.  Highland Stone Capital Management, LLC

Defaulting defendant Highland was a New Jersey Limited Liability Company that conducted business at 50 Broad Street, New York, NY – the same location at which FCP sometimes did business. (Burgos 56.1 ¶ 2.)  Defendant Burgos was its sole member.  (Id.) It has never been registered with the CFTC in any capacity.  (Id.)

### 4.  Susan Davis

Defendant Davis was President and a director of FCG and a signatory on its bank accounts.  (Id. ¶ 8.)  She was President, Secretary, and a director of FCP and a signatory on its bank accounts as well.  (Id. ¶ 9.)  Her day to day responsibilities consisted of serving as head of "back office compliance, compliance as it pertained to paperwork[] like applications," as well as "compliance duties . . . as far as account

opening" (<u>Id.</u>; Pl.'s 56.1 Reply ¶ 30.)  At all relevant times, Davis owned either one-third or one-half of outstanding FCP stock.  (Davis Howard 56.1 ¶ 9.)

The CFTC alleges that Davis supervised and had the ability to hire and fire the sales agents who solicited customers for the Forex Capital Entities.  (Pl.'s 56.1 ¶ 56(a).)  It supports this assertion by submitting entries bearing Davis's name on the computer software program "Dashboard", which the Forex Capital Entities used to identify the marketing materials sales agents were sending to prospective customers and to track the agents' contacts for marketing and sales leads.  (Pl.'s 56.1 ¶ 56(b).)  Davis testified that she merely set up the system and did not author those entries – she notes that the entries bear the initials of supervisory employees who actually entered the data.

The CFTC supports its further assertion that Davis could hire and fire employees with a letter from Davis to sales associate Tanya Dunnaway Jackson dated March 25, 2010, in which Davis informs Jackson that she "will be terminated immediately without further discussion" if she demonstrates continued absences or tardiness.  (Letter of Susan Davis to Tanya Jackson, Mar. 25, 2010, Decl. of Joy McCormack ("McCormack Decl.") Ex. 64, ECF No. 107.)  Davis responds that she did not possess hiring and firing authority for the sales staff, but rather that she only supervised the administrative staff.  (Dep. of Susan Davis ("Davis Dep." at 123:9-14, McCormack Decl. Ex. 5.)  She was the signatory to the Jackson letter only because Howard gave her permission to communicate the probation message.  (<u>Id.</u> at 53.)  Sales agents such as Jackson were independent contractors who were to

negotiate their terms of engagement with Howard or one of the other sales executives.  (Id.)

Davis registered as an associated person ("AP") of a new commodity trading advisor ("CTA"), Forex Capital Trading Partners NA, Inc., on May, 31, 2011,[2] but was never registered in any other capacity with the CFTC, including in her roles with FCP and FCG.  (Id. ¶ 7.)

### 5.  David Howard

Defendant Howard was the CEO, Director of Sales and Marketing, and a Director of FCP.  (Davis Howard 56.1 ¶¶ 11, 57(b).)  At all relevant times, Howard owned either one-third or one-half of outstanding FCP stock.  (Id.)  From time to time, Howard revised the sales scripts used by the Forex Capital Entities' agents to solicit prospective customers.  (Id. ¶57(b).)

The CFTC argues that Howard had the authority to hire and fire sales agents who solicited customers and the authority to enter into financial transactions for the Forex Capital Entities.  (Id.; Pl.'s 56.1 ¶ 11.)  It presents testimony that Howard interviewed at least one sales staff applicant (Dep. of Nora Matti at 31:11, McCormack Decl. Ex. 10), that the same applicant believed Howard had hiring authority and set marketing goals (Id. at 55:14-17, 42:6-19), that another sales agent viewed Howard as a supervisor  (Brady Dep. at 34:25-36:8, McCormack Decl. Ex. 11), and that he was involved in the decision to place Jackson on probation (Davis Dep. at 52-53).

---

[2] FCTP NA, Inc. is not a party to this action.

FCP terminated its relationship with Howard in March 2011 by corporate resolution. (Davis Howard 56.1 ¶ 11.) Howard has never been registered in any capacity with the CFTC. (Davis Howard 56.1 ¶ 10, ECF No. 137.)

### 6.  Joseph Burgos

Defendant Burgos was the sole and managing member of Defendant Highland and held himself out to the public as such. (Burgos 56.1 ¶ 6.) He controlled Highland's bank and trading accounts. (Id.) He has never been registered with the CFTC in any capacity. (Id.)

### ii.  Burgos's Prior Trading History

Burgos first opened forex trading accounts for Highland in 2008. (Burgos 56.1 ¶ 15.) The CFTC submits its investigator's analysis of accounts held in the name of Burgos or Highland, which concludes that Burgos lost $56,665 in the forex market between February 2005 and March 2010, constituting 98% of his trading accounts' net deposits. (Pl.'s 56.1 ¶ 16; Pl.'s Mem. of L. Ex. 1 ¶ 60; id. att. 47.) Burgos argues that the investigator's data is mistaken or exaggerated since "the majority of those accounts were sub-accounts under Highland that belonged to prop[prietary] traders that traded their own funds under Highland." (Burgos 56.1 ¶ 16.)

### iii.  FCG Forex Trading Activities

### 1.  Forex Capital Entities -Highland Agreement

Davis, Howard, and the Forex Capital Entities began to solicit accounts in 2009. To do so, on April 29, 2009, Davis, on behalf of the Forex Capital Entities,

entered into an introducing agreement with City Credit Capital ("CCC"), a UK-based forex broker, which then hosted the individual investors' forex trading accounts.  (Davis Howard 56.1 ¶¶ 12, 17.)  A year later, in June 2010, Davis and Howard, on behalf of the Forex Capital Entities, entered into a similar agreement with Cyprus-based forex broker Windsor Brokers, Ltd. ("Windsor").  (Id. ¶ 18.)  The Forex Capital Entities represented themselves as an "introducing broker" ("IB") on their website and in their marketing materials.  (McCormack Decl. Att. 21 at HSCM-752-01-00009.)

In August 2009 – between the CCC and Windsor agreements -- the Forex Capital Entities entered into an agreement with Burgos to make Highland the exclusive trader of their managed forex accounts.  (Id. ¶ 21.)

The Forex Capital Entities solicited individual customers to open retail accounts at CCC or Windsor via unsolicited calls from purchased lists.  (Id. ¶ 22.)  The independent contractor sales agents making the calls used a handbook provided by the Forex Capital Entities.  (Id. ¶ 22.)

Davis and Howard admit that many of the U.S.-based customers solicited to open accounts with CCC or Windsor were not "Eligible Contract Participants" ("ECPs") as defined by the CEA. (Id. ¶¶ 23, 26.)  The CEA defines an ECP as an individual whose assets exceed $10 million, or one whose assets exceed $5 million and enters into a forex transaction solely to manage risk.  7 U.S.C. § 1a(18)(A)(xi).

In addition, at least some of the investors who opened accounts signed limited power of attorney authorizations to the Forex Capital Entities.  (Id. ¶¶ 12,

19.) However, Highland and Burgos did not hold any POAs for the accounts traded through CCC and Windsor. (Id. ¶ 20.)

### 2. Marketing Materials

As part of their marketing efforts, the Forex Capital Entities touted Burgos's experience and skill as a forex trader. The Forex Capital Entities' websites quoted a book excerpt that included Burgos as "one of the finest currency traders in the world." (Davis Howard 56.1 ¶40.) One of the sales agents, Nora Matti, testified: "[O]ur job was really to promote Joe [Burgos]. Joe is the star of the show and our job was to promote Joe and bring in capital so he could trade in his company." (Dep. of Nora Matti, McCormack Decl. Ex. 10 at 106:8-10.) She summarized that "[t]he whole selling point was that Joe's track record was unparalleled . . . ." (Id. at 72:2-24.)

### 3. Highland Performance Chart

Critical to the allegations in the CFTC's complaint, Highland and the Forex Capital Entities each posted a Performance Chart to their respective websites, showing a track record of high performance yields for managed accounts from the period 2004-2010. (Davis Howard 56.1 ¶ 36.) Forex Capital Entities sales agents also attached the Performance Chart to follow-up emails to potential customers. (Pl.'s 56.1 ¶ 40; McCormack Decl. Ex. 28 at HSCM 311-02-000063; id. Ex. 43 at HSCM 303-02-000035.) On Highland's web site, Burgos labeled the returns on the Performance Chart as results for "HSC Managed Accounts." Davis updated the Performance Chart monthly – she says merely by copying the results from the

Highland site – and posted the results to the Forex Capital Entities' web sites. (Davis Howard 56.1 ¶ 36.)

The CFTC, Davis, and Howard now agree that the Performance Chart is false and does not reflect actual trading data. (Id.) Davis and Howard admit they used the Performance Chart to solicit new accounts, but they argue they only learned the chart was false during the course of the CFTC investigation. (Id.) They assert that Burgos told them the data was for actual accounts. They point to an email where Burgos forwards what purports to be data from a single real account as evidence that he misled them about his past results. (Davis Howard 56.1 ¶ 36; id. Ex. 47 (email).) The email does not mention the Performance Chart.

Davis and Howard admit that, on behalf of the Forex Capital Entities, they considered an outside audit of the Performance Chart data as early as November 2009 and attempted to retain an audit firm, but that no audit was performed. (Davis Howard 56.1 ¶ 42.) Defendants demonstrate that Forex Capital Entities officers emailed several audit and accounting firms in February 2011 to inquire about commissioning an audit of Highland's 2010 returns. (Davis Howard 56.1 Ex. 45.) Davis testified that she eventually hired an audit firm and "fought with [Burgos] ever day to get" the monthly financial statements for 55 Highland-traded accounts necessary for such an audit, but her efforts were unsuccessful. (Davis Howard 56.1 ¶ 42; Prelim. Inj. Hearing ("PI Hearing") at 277:19-24, 506:25-507:4, McCormack Decl. Ex. 4.) She told the Court at the PI hearing that she was so

aggressive in seeking the statements that Burgos "wouldn't even return my texts because all he . . . said . . . I cared about was getting this audit." (Id.)

Davis testified that she monitored the balances in client accounts, but not on a daily basis. (Davis Dep. at 55-56.) She stated that the clients – not the Forex Capital Entities – received trading statements directly from the RFED every day that a trade executed and that the Forex Capital Entities did not have access to those statements. (Id.) Davis admitted that she could access the account balances, but said she understood it was Highland and Burgos's responsibility to monitor the accounts on a daily basis; Davis's sole job was to do back-end compliance – which she did not define as encompassing compliance with CFTC regulations. (Id.)

Burgos testified that he never represented the data on the Performance Chart as being actual trading results of customer accounts – rather, it displayed the results of "demo" trades or "hypothetical trading" using an algorithm Burgos had created to generate hypothetical accounts. (Id.; Burgos 56.1 ¶ 36.) Burgos admits he knew that the Forex Capital Entities used the Performance Chart to solicit customers and admits he never directly discussed with the Forex Capital Entities that the accounts were hypothetical. (Burgos 56.1 ¶ 36; Testimony of Joseph Burgos at Prelim. Inj. Hearing, Pl.'s 56.1Ex. 4 at 387.) At the same time, however, Burgos admits he told Davis the results on the Performance Chart "were from actual signal trading". (Burgos 56.1 ¶ 36.) He states that he told "both Davis and Howard on several occasions to stop sending out statements and track records of such signals and rates of return." (Burgos Testimony, PI Hearing at 387.) He

alleges that "both Davis and Howard agreed to stop using these materials but then continued to do so." (Id.)  Burgos testified that when he worked with a different entity, FXEM, he had included "a disclaimer that said hypothetical trading right under it" but that, once he ceased his association with FXEM, he included the chart on the Highland website but did not include the disclaimer.  (Id. at 385-88.)  He omitted the disclaimer on Highland's chart because he "wasn't soliciting any clients . . . and I never have on this [web] page." (Id. at 388.)

### 4.  Sales Solicitation with Performance Chart Data

The Forex Capital Entities sent the Performance Chart data to prospective customers.  For example, in March 2010, Howard emailed prospective customer David Todnem with false Highland proprietary account statements showing profitable trading and an alleged "verification" of those statements from a firm called Interbank FX ("IBFX"), for which Burgos had allegedly traded previously. (Pl.'s 56.1 ¶ 49; Davis Howard 56.1 ¶ 49; McCormack Decl. Ex. 39.)  A Forex Capital Entities account executive also forwarded "3 verified account statements" assembled by Highland to Todnem on April 15, 2010.  (Davis Howard 56.1 Ex. 46 at HSCM-002-15-000008.)  Howard sent an email to Todnem on March 19, 2010, in which he wrote:

> I have known Joe Burgos for years. . . .  On a professional note, I have witnessed Joe trade with great efficiency and skill for clients over the years and know for a fact that he has long standing relationships with his clients.

*        *        *

> Although I have seen his trading throughout the years, the printable verifiable records are coming from Interbank, the firm he traded through previously. We are awaiting the records from them to be sent to the accountants.
>
>        \*       \*       \*
>
> This by no means we do not verify the records and through speaking with Interbank and the accountants myself, I decided to introduce Joe to FCTP as a trader for the managed accounts.
>
>        \*       \*       \*
>
> I understand your concern as we are in the same situation. . . . With that being said, <u>I assure you that I will personally get you the written</u> (NOT verbal from Interbank as I have those from the start as part of FCTP's due diligence process) trade record confirmations as soon as I receive them myself.
>
> From the standpoint of the FCTP accounts, we can see the trading "live." This means that we do not have to rely on any other firm to see the accounts managed by Joe. The account statements that are being sent out . . . are 100% verified by us and need no outside verification. These are the same statements you will receive when your account starts trading.

(Email of David Howard to David Todnem, Mar. 19, 2010 ("Mar. 19, 2010 Todnem Email"), McCormack Decl. Ex. 44 at HSCM-303-02-000198.) The CFTC argues that Howard's statement that "I will personally get . . . trade record confirmations" indicates a promise to obtain the statements directly from IFTX; Davis and Howard respond that Howard intended to get the statements from Burgos and never promised Todnem otherwise. (<u>Compare</u> Pl.'s Reply Br. at 10 <u>with</u> Davis Howard 56.1 ¶ 49.)

In his email to Todnem, Howard attached an IBEX account statement for a single Burgos-managed account (the "$9.5k Account"), showing an increase in value

from $9,500 to $215,840 from 2007 to 2009.  (Mar. 19, 2010 Todnem Email;

McCormack Decl. Ex. 59 Att. 2A at HSCM 303-02-000035.)  The CFTC's

investigator states that no actual account corresponding to that data exists.

(McCormack Decl. ¶ 39.)  Burgos admitted that, as with the underlying

Performance Chart data, the IBFX data sent to Todnem was not from real accounts,

but rather from "back-tested algorithm accounts" or "demo accounts".  (Testimony of

Burgos at 433-34, PI Hearing.)  Burgos neither told Davis and Howard that the

data was from real accounts, nor did he explain that they were demo accounts.[3]

(Id.)  Davis testified that she believed the IBFX data was "true and correct", based

upon a "notarized statement" in the IBFX report furnished to the Forex Capital

Entities.  (Testimony of Davis at 202-04, PI Hearing.)

     5.  <u>Procurement of Rankings Using Performance Chart Data</u>

In November 2010, William Kelly, a Forex Capital Entities officer, contacted

a financial industry rankings organization, Daniel B. Stark & Company ("Stark"),

for the purpose of obtaining a broker ranking for Highland.  (Davis Howard 56.1 ¶

47; Burgos 56.1 ¶ 47; Davis Dep. at 101:11-22, McCormack Decl. Ex. 5.)  Burgos

submitted the Performance Chart numbers to Stark directly.[4]  (Email from Joseph

Burgos to Cynthia Campos-Gutierrez, Daniel B. Stark & Co., Nov. 4, 2010,

McCormack Decl. Ex. 61 at HSCM-408-01-000004.)  After Burgos entered the data,

---

[3] Burgos alleges in his 56.1 statement – without citation to record testimony – that Howard did not advise him that the data would be sent to prospective customers.  (Burgos 56.1 ¶ 49.)  The Court cannot consider this statement where no such evidence exists in the record.

[4] Burgos states in his 56.1 statement – without citation to his deposition or other sworn record evidence – that he "contests" the assertion that Highland submitted the Performance Chart numbers.  (Burgos 56.1 ¶ 47.)  However, as Burgos presents no evidence in the record to support this conclusory denial, it does not raise a triable issue of fact.

Stark's representative, Cynthia Campos-Gutierrez, wrote to him and requested that he "check for accuracy" the "performance . . . history." (Email from Cynthia Campos-Gutierrez to Joseph Burgos, Nov. 5, 2010, McCormack Decl. Ex. 61 at HSCM-408-01-000007.)  Burgos responded, "[i]t[ ] all looks accurate now." (Email from Joseph Burgos to Cynthia Campos-Gutierrez, Nov. 5, 2010, McCormack Decl. Ex. 61 at HSCM-408-01-000007.)   Kelly testified that he believed Stark performed its own audit of any performance data and that the Forex Capital Entities only saw the data after it had been uploaded.  (Kelly Dep. at 175:20-177:9, 177-80, McCormack Decl. Ex. 12.)

In March 2011, Campos-Gutierrez asked "[i]s Highland Stone registered with the [National Futures Association]?"[5] and Kelly responded, "[h]aving attys filing on that . . . as we speak." (Email of William Kelly to Cynthis Campos-Gutierrez, March 11, 2011, McCormack Decl. Ex. 61 at HSCM-408-01-000013.)  On April 4, Campos-Gutierrez emailed to advise Kelly that, "due to new NFA regulation, we have chosen to remove CTA's from our database who not registered with their countries regulatory body (i.e. NFA). Please advise when your NFA approval has been obtained." (Email of Cynthia Campos-Gutierrez to William Kelly, April 4, 2011, McCormack Decl. Ex. 61 at HSCM-408-01-000015.)

Also in November 2010, Highland also submitted the Performance Chart to a second financial rankings firm, Barclay Hedge, Ltd. ("Barclay"), in order for Barclay to rank Burgos as a trader.  (Davis Howard 56.1 ¶ 44; Burgos 56.1 ¶ 44.)  Davis and

---

[5] The CEA's registration requirements mandate that covered entities and persons register with the NFA, the self-regulatory organization of the futures industry.  See Who We Are, National Futures Assocation, at http://www.nfa.futures.org/NFA-about-nfa/index.HTML (last visited August 5, 2013).

Howard admit that, as with Stark, Kelly contacted Barclay to arrange the ranking and Highland then uploaded the Performance Chart data.[6] (Davis Howard 56.1 ¶ 44; Burgos 56.1 ¶ 44.)  Based upon the Performance Chart numbers, Highland was for a time listed as Barclay's top forex trader.  (Pl.'s 56.1 ¶ 44; Barclay DataFinder Commodity Trading Advisor Rankings at HSCM-310-03-000010, McCormack Decl. Ex 45.)

Shortly after Barclay first ranked Highland, Sol Waksman, Barclay's principal, became skeptical of Highland's reported performance and requested an opinion letter and audit report from Highland's accountant, verifying Highland's returns.  (Burgos 56.1 ¶ 44; Davis Howard 56.1 ¶ 44; Decl. of Sol Waksman ("Waksman Decl.") ¶¶ 7-8, McCormack Decl. Ex. 23; Testimony of Sol Waksman at 76:18-23, PI Hearing.)

On November 8, 2010, Burgos submitted a letter entitled "Independent Auditor's Report", dated October 29, 2010, which stated it was authored by the accounting firm of "J. Panaque and Associates, P.A."  (Waksman Decl. ¶ 9.)  The document stated:

> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2009, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States . . . .

(Id. att. B.)

---

[6] Burgos argues in his 56.1 statement – without citation to his deposition or other sworn record evidence that Kelly "stated it was fine to post returns with Barclays without any verification of returns. Kelly stated they do not ask for it." (Burgos 56.1 ¶ 44.) The Court does not consider this statement as it is not supported by any record evidence.

Two days later (November 10, 2010), Waksman received a second letter purportedly from the accounting firm, this time spelling the firm's name as "Jorge L. Paneque, P.A." (Id. ¶ 11 (emphasis added).) The letter stated "I have reviewed and verified the statements of the company as of December 31, 2009." (Id. att. C.)

Paneque is an accountant whom Burgos had retained to prepare his personal taxes, but Paneque did not author the "Independent Auditor's Report" and, while he supplied a similar letter to the letter of November 10, the statement in the November 10 letter that Paneque had "reviewed and verified" Highland's statements had been falsified. (Testimony of Jorge Paneque at 86:18 – 91:7, PI Hearing.) Paneque learned that the letters had been falsified after Kelly called Paneque to verify their authenticity and faxed him the falsified copies. (Id.) Barclay removed the Highland data and ranking from its website shortly after it was advised that the audit letters were falsified. (Burgos 56.1 ¶ 44; Davis Howard 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.)

Burgos admitted at his deposition that "we created this independent auditor's report"[7]. (Burgos Dep. at 108-14, McCormack Decl. Ex. 9.) He also admitted that he added the statement in the December 31 letter that Paneque's office had verified Highland's statements. (Id. at 112-13.) He said he did so because the actual letter furnished by Paneque was "too general" to satisfy Barclay's audit requirement. (Id. at 116.) Burgos indicated that he had faxed the letters to the Forex Capital

---

[7] Burgos specifically testified that the "we" he referred to was himself alone. (Burgos Dep. at 110.) In his Rule 56.1 Statement Burgos contests that he admitted creating the Independent Auditors Report, but he submits no record evidence to support this bare assertion; the Court therefore disregards the assertion.

Entities' representative, Kelly, with the understanding that Kelly would forward them to Barclay. (Id. at 113-15.) Burgos did not believe any Forex Capital Entities personnel were aware that he had authored the first letter and altered the second. (Burgos Dep. at 110:24-111:11.)

However, Davis and Howard admit that Kelly told them about his conversation with Paneque "right after" it took place. (Davis Howard 56.1 ¶ 45; Testimony of Kelly at 110:6-8, PI Hearing.) Davis testified that she thereafter spoke with Burgos, who claimed that his secretary had altered the letter but that an audit had, in fact, taken place. (Testimony of Davis at 276:21-277:10, PI Hearing.) Davis did not contact Paneque to determine whether he had ever audited Highland because, she testified, Kelly was the Forex Capital Entities liaison to Barclay. (Id.)

### 6.  Use of Highland Data after November 2010

Davis testified that after the Paneque and Stark incidents in November 2010, "we never republished [Burgos's] numbers again." (Id. at 504:14-16.) She and Howard "moved away from [Burgos] after a year because he always had an explanation of what was wrong. . . . And they were plausible." (Id.) Davis testified that, although she ceased to update the Performance Chart on the Highland website after November 2010, the chart remained on the website until July 2011 when the Forex Capital Entities ceased marketing the Highland product. (Testimony of Davis at 504:14-16, PI Hearing.)

The CFTC presents uncontested evidence that, despite Davis's testimony, the Forex Capital Entities sent out Burgos's trading performance numbers and the

Barclay and Stark rankings to at least one prospective customer after the Paneque incident.  The prospective investor, Kurtis Kludt, testified that he contacted Forex Capital Entities sales associate Nora Matti in March 2011.  (Dep. of Kurtis Kludt at 16:16-25, 34:18-35:6, 69:22-70:1, McCormack Decl. Ex. 14.)  Matti gave Kludt a sales pitch in which she told him that the Forex Capital Entities' returns averaged 70 percent per year and on March 11, 2011, furnished the Barclay and Stark ratings incorporating the Performance Chart data.  (Id.)

### iv.  Forex Capital Entities' Customer Losses

The CFTC submits summary charts it prepared that assert 103 of 106 accounts opened by the Forex Capital Entities lost money; it states the losses totaled $2.42 million, or an aggregate of more than 93%.  (Pl.'s 56.1 ¶¶ 32, 33.) Apart from a single example account it presents on a CFTC-created spreadsheet, showing a loss of $2,144 in July and August 2009, the CFTC does not submit the individual account data to support these calculations, however.  (Pl.'s Reply Br. Ex. A, ECF No. 154.)

Davis and Howard admit they opened the accounts and earned fees on a per-account basis, irrespective of the profits made by those accounts.  (Davis Howard 56.1 ¶¶ 24, 31.)  However, they dispute the dollar value of the losses (and do not admit net losses occurred), arguing that the CFTC data mistakenly includes accounts that were either self-traded or traded by entities other than Highland. (Davis Howard 56.1 ¶ 24.)  They admit that the Forex Capital Entities received fees from CCC and Windsor based on the number of accounts they opened, but they

argue that the CFTC's calculation of those fees based on account statements was too high. (Id. ¶¶ 28-29.)[8]  In addition, while Davis, Howard, and Burgos admit at least some distribution occurred to each of them individually, they dispute the extent to which the profits were distributed.[9]  (Pl.'s 56.1 ¶ 31; Davis Howard 56.1 ¶ 31; Burgos 56.1 ¶ 31.)

The CFTC alleges that Davis and Howard knew that the Forex Capital Entities' managed accounts suffered significant losses, but they failed to tell customers of those losses and, in fact, consistently reported positive returns on the Performance Chart.  (Pl.'s 56.1 ¶ 37; compare McCormack Decl. Ex. 2 Att. 2 (CFTC summary noting losses of $1.2 million in calendar year 2010) with id. Ex. 1 Att. 21 at HSCM 750-01-00009 (Performance Chart on FCG website showing gains in managed accounts of 51.94% for calendar year 2010)).  It points to five pieces of evidence in this regard:

### 1.  Access to Customer Accounts

First, the CFTC alleges Davis and Howard had access to their customers' accounts.  Burgos testified that Davis and Howard had the passwords to the customer accounts at CCC and Windsor and could thus determine whether the accounts were profitable.  (Pl.'s 56.1 ¶ 41(a); Burgos 56.1 ¶ 41(a); Burgos Dep.,

---

[8] The CFTC analysis indicates that FCG earned $202,869 from CCC but Davis and Howard state the amount was only $175,074 (Pl.'s 56.1 ¶ 28; Davis Howard 56.1 ¶ 28); the CFTC alleges the Forex Capital Entities earned $247,895.65 from procuring accounts for Windsor, but Davis and Howard state the amount was only $232,526, which also included monies from self-traded accounts and accounts where Highland was not the trader.  (Pl.'s 56.1 ¶ 29; Davis Howard 56.1 ¶ 29.)

[9] Davis and Howard dispute the CFTC's characterization that they received a "share" of the profits; they say they drew a small salary and sometimes took no distributions from the arrangements. Burgos clarifies that Highland only had a Service Agreement with the Forex Capital Entities and thus did not receive service payments from FCG.  (Davis Howard 56.1 ¶ 31; Burgos 56.1 ¶ 31.)

McCormack Decl. Ex. 9 at 122-125.) Davis testified at her deposition that she also had access to master and individual passwords for the CCC and Windsor accounts, which she used for the purpose of assisting customers to set up their accounts. (Pl.'s 56.1 ¶ 41(a); Davis Dep., McCormack Decl. Ex. 5 at 70:11-71:24.)

### 2.  Customer Complaints to the Forex Capital Entities

Davis and Howard received complaints from at least four customers about losses in their accounts. (Pl.'s 56.1 ¶ 41(b).)  First, investor Jason Sunderland had invested via the Forex Capital Entities after receiving the Highland Performance Chart data from Davis on November 9, 2009. (Email from Susan Davis to Jason Sunderland, McCormack Decl. Ex. 63.)  However, Sunderland testified that he experienced losses on November 27, 2009, after which he emailed Burgos, Davis and Howard. (PI Hearing, McCormack Decl. Ex. 4 at 147:22-149:1, 153:18-154:24 (testimony of Jason Sunderland).)  Burgos claimed that a software issue had caused the account to precipitously decline in value. (Id.)  Sunderland testified that Howard and Davis also first blamed a software issue, but then changed their story to blame an Internet connectivity failure – what Howard termed "an act of God". (Id.)  Howard and Davis promised to fix the issue by restoring Sunderland's account to its original $50,000 balance, but never did so. (Id. at 150-153.)

In January 2010, Sunderland participated in a conference call in which the second investor, his father Richard Sunderland (a financial advisor who had convinced half a dozen clients to invest with the Forex Capital Entities) complained

to Burgos and Howard that his clients' accounts had declined between 20 and 40 percent. (Id. at 153.)

The CFTC submits an affidavit of a third investor, Stephen Dubin, who also invested after receiving a copy of the hypothetical IBEX account data. (Decl. of Stephen Dubin ¶ 9, McCormack Decl. Ex. 58.) Dubin states that he sent an email to the Forex Capital Entities on February 27, 2010, complaining of "significant and sudden losses" in his account. (Id. ¶ 19.) After the account picked up in March and then dropped again, Howard promised Dubin that Burgos would "work their way out of" the losses. (Id. ¶¶ 20, 24.) Dubin lost his entire $10,000 principal investment, save a $40 transfer fee which Howard refunded in August 2010. (Id. ¶ 23.)

A fourth investor, Todnem, stated that his $10,000 initial investment opened in May 2010 was "consistently losing money". (Decl. of David Todnem ¶ 11, McCormack Decl. Ex. 59.) Todnem unsuccessfully instructed the Forex Capital Entities to stop trading his account and attempted to contact the company's principals; he eventually reached Howard, who explained that the market had been "behaving irrationally", indicated that Todnem's account would be closed out at approximately $6,000 and promised to send Todnem account closure forms for him to recoup that amount. (Id.) When Todnem received the form on May 21, 2010, his actual account balance was $272.36. (Id.)

### 3. Internal Emails About Burgos Losses

In addition to the customers' reported losses, Davis and Howard were parties to a number of internal emails discussing concerns about Burgos's trading losses. (Pl.'s 56.1 ¶ 41(c); Burgos 56.1 ¶41(c).)

For instance, Davis sent an email to Burgos dated February 4, 2010, in which she stated:

> [T]he status of the accounts have me very concerned. Tell me to relax. But could you give me an idea of your strategy. I know you don't like that the customers can see everything, but I need to field them off. As I get better at this I won[']t need to bug you. But sometimes I get scared as, like them, I am kind of ignorant of how this works.

(Email of Susan Davis to Joseph Burgos, Feb. 4, 2010, McCormack Decl. Ex. 34.) Howard was subsequently copied on this email chain. (Id.)

On August 11, 2010, Davis wrote Burgos again, stating: "Joe this just is surreal. What is going on. We can[']t survi[v]e like this. Please tell me why we are in this position again. I texted yo[u] last night. This is irresponsible." (Email of Susan Davis to Joseph Burgos, Aug. 11, 2010, McCormack Decl. Ex. 42.)

A few days later, Howard wrote to Burgos, copying Davis, stating his worries that "[n]obody has traded since the 12th . . . . The CCC account are basically shot without explanation" and "the brand new account at Windsor has one trade." (Email of David Howard to Joseph Burgos, Aug. 16, 2010, McCormack Decl. Ex. 35.) He continued:

> I assure you that we can and will make this work, but we cannot decimate any more accounts and we need to trade. You do so well when you trade on the intraday. We need to stick to it and keep focused on the clients making small but sustainable profits, not big bets with no one watching. At all times we need to have someone watching so we do not have a time go by when you have open positions that keep us stuck for days without trading.

(Id.)

In September 2010, Howard wrote to Burgos, asking Burgos to detail his investment strategy and noting "I am anticipating this being a difficult situation if we carry these losses or 'get stuck' in the positions." (Email of David Howard to Joseph Burgos, Sept. 13., 2010, McCormack Decl. Ex. 27.) He concluded:

> This is a very critical time for us and with 300+ MORE coming this week, we have to [be] able to trust the trading will 1) reflect the track record (notice I did not say profitable) and 2) 3-5 MINIMUM trades a day . . . . I know I sound like a broken record, but this is the last time we can raise funds and watch them disappear. The CCC accounts are able to trade as well, can I get a strategy for them as well.

(Id.) Burgos responded to Howard:

> The account is still trading. I just actually closed a trade so I am being very proactive. I will continue to trade the account normally. It will be back in no time.
>
> As for the CCC accounts same strat as the last time I wrote to you nothing has changed. Most of these accounts are too tight on margin to trade. I can only remove hedges at specific levels. 1.2600 or below is my target and since the last time we spoke we haven't gotten there yet.

(Email of Burgos to Howard, Sept. 13, 2010, McCormack Decl. Ex. 27.)

By December, Howard expressed frustration to Davis, writing:

> I am frustrated that my wife is pissed constantly and we are going out and raising money to salvage what we have and each time we get close to a million dollars it vanishes in his hands. I do not want to blow any

more accounts and we need to have full discretion on the accounts if he decides to stay on with us. . . . We are out thousands and have yet to get a check two months in a row.

(Email of David Howard to Susan Davis, Dec. 22, 2010, McCormack Decl. Exs. 24, 36.)

### 4. Davis's Summary Chart

In addition to the emails acknowledging losses, the CFTC's fourth set of evidence consists of a chart Davis put together for the periods ending April and May 2010 because, she testified, Howard "wanted to see what Joe was doing or the company was doing." (Pl.'s 56.1 ¶ 41(d).) Davis shared the chart with Howard and Burgos. (Davis Howard 56.1 ¶ 41(d).) The CFTC states that, had Davis calculated the ending balances for the periods in the chart, there would have been a 94% account balance decline in May 2010. (Pl.'s 56.1 ¶ 41(d).) It points to Davis's testimony that she did not perform the full analysis because "this is a lot of work" and because her "computer hard drive burned down and wiped out all of [her] information.]", including the chart. (Id.; Davis Dep. at 146:9-11, 148:6-18.)

Davis and Howard reply that the 3-page chart produced by the CFTC is unreliable because it duplicates the first page, omits the second page, and includes a third page that did not pertain to Highland; Davis claims that the original file was lost as part of the computer failure.[10] (Davis Howard 56.1 ¶ 41(d).) Davis and Howard do not state any position as to whether the actual chart showed similar losses. (Id.)

---

[10] The Court takes notice of the fact that the first two pages of the CFTC's chart are indeed duplicates.

5.  <u>Forex Capital Entities Corporate Structure</u>

The fifth and final set of evidence submitted by the CFTC in support of Davis and Howard's knowledge of the losses consists of the CFTC's allegation that the two defendants were board members of the Forex Capital Entities and thus, according to the FCP bylaws, manage "the business and affairs of th[e] corporation" and "all corporate powers" were exercised "by or under" the Board's direction.  (Bylaws of Forex Capital Trading Partners ¶ 1, McCormack Decl. Ex. 40.)

Davis and Howard respond that the Board could only take action by unanimous vote and that the various directors each managed a separate area; they claim that Davis managed only administrative support and compliance as regards opening accounts and Howard served as CEO and Director of Marketing.  (Davis Howard 56.1 ¶ 41(d).)  They admit that from June 2010 through August 2010 that Davis and Howard were the only two Directors; at all other times there was at least one additional director.  (<u>Id.</u>)

In their testimony at the PI hearing and in argument here, Davis and Howard argue that their jobs rarely required them to interact with customers directly, their misstatements on the Performance Chart merely reported the results Burgos provided, and that some of the data on the Forex Capital Entities website encompassed accounts that were not managed by Burgos.  (Davis Howard 56.1 ¶¶ 37, 41; Evidentiary Hearing, McCormack Decl. Ex. 4 at 237-238, 256 (Davis testifying that she merely posted the results reported by Burgos).)

### b. Procedural Background

The CFTC brought this action on July 27, 2011, pursuant to its authority under the Commodities Exchange Act ("CEA") and its implementing regulations. (Compl., ECF No. 1.) Section 6c of the CEA confers jurisdiction on this Court to hear CFTC petitions for permanent injunctive relief "against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder." 7 U.S.C. § 13a-1(a). Section 6c provides for various equitable remedies for CEA violations, including permanent injunctive relief, disgorgement, and civil penalties. 7 U.S.C. §§ 13a-1(a)-(d).

The CFTC named as defendants Burgos, Davis, and Howard in their individual capacities, as well as the corporate entities Highland, FCP, and FCG. It alleged five counts in its Complaint. The first three are alleged against all defendants: (1) fraud in connection with forex under §§ 4b(a)(2)(A)-(C) of the CEA; (2) failure to register as a Commodity Trading Advisor ("CTA") in violation of CEA § 2(c)(2)(C)(iii)(I)(bb) and Regulation 5.3(a)(3)(i); and (3) failure to register as an Associated Person of a CTA under CEA § 2(c)(2)(C)(iii)(I)(aa) and Regulation 5.3(a)(3)(ii). The final two counts are alleged as against Davis, Howard, and the Forex Capital Entities only: (4) failure to register as an Introducing Broker ("IB") under CEA § 2(c)(2)(C)(iii)(I)(aa) and Regulation 5.3(a)(5)(i); and (5) acting as an Unregistered Associated Person of an IB in violation of CEA § 2(c)(2)(C)(iii)(I)(aa) and Regulation 5.3(a)(5)(ii).

The Court issued a Clerk's Certificate of Default pursuant to Fed. R. Civ. P. 55(a) on October 14, 2011 (ECF Nos. 47, 49, 50) against the corporate defendants – Highland, FCG, and FCP.  Following an adjournment due to Hurricane Sandy, the Court held an Order to Show Cause for default judgment hearing on November 26, 2012, in which the corporate defendants failed to appear.  The Court, inter alia, entered default judgment against the corporate defendants for each cause of action alleged in the Complaint, permanently enjoined them from further violations of the CEA, and ordered disgorgement and interest payments in the amount of $486,915.84.  (ECF No. 136.)  The default judgment and permanent injunction against the Corporate Defendants are not at issue on the instant motion.

Rather, the CFTC now seeks summary judgment as to all causes of action against pro se defendants Davis, Howard, and Burgos.  Davis and Howard have appeared since the litigation commenced in 2011, but Burgos only appeared and answered in November 2012, after an Order to Show Cause was entered against him.[11]  The CFTC's initial summary judgment motion (ECF No. 106) sought relief against Davis and Howard alone; after Burgos filed his answer, the Court granted the CFTC's request to amend the summary judgment motion to add Burgos on all counts.  (ECF Nos. 133, 135.)  In its revised motion, the CFTC seeks a permanent

---

[11] The CFTC moved for the entry of default against Burgos on October 12, 2011.  (ECF No. 45.) Burgos filed a answer on October 13, 2011 but that answer was rejected due to his failure to properly serve the other parties.  (ECF No. 46.)  The CFTC moved for the entry of default judgment against Burgos on September 19, 2012 (ECF No. 109.)  The Court held an Order to Show Cause hearing on November 26, 2012, at which Burgos appeared pro se and represented to the Court that he had assumed his answer had been timely and properly filed.  (ECF No. 131.)  The Court accepted Burgos's late-filed answer.  (Id.)

injunction against all three defendants, as well as disgorgement and civil monetary penalties.

## II. STANDARD OF REVIEW

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making that determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732. 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue for trial and cannot rely merely on allegations or denials contained in the pleadings. Fed. RR. Civ. P. 56(c),(e); see also Wright v. Goord. 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 539 F.3d 159, 166 (2d Cir.2010) (citations omitted). Only disputes over material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than
simply show that there is some metaphysical doubt as to the material facts").

The Court must liberally construe the evidence submitted by pro se
defendants. See Byng v. Wright, No. 09 Civ. 9924, 2012 WL 967430, at *6 (S.D.N.Y.
Mar. 20, 2012)(citing Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1998). This
liberality "requirement . . . is especially strong in the summary judgment context
where claims are subject to a final dismissal.")

## III.DISCUSSION

The CFTC's main assertions on summary judgment fall into two categories:
first, Count I asserts that Burgos, Howard, and Davis made intentional or reckless
statements or omissions to cheat or defraud the investors in the Forex Entities /
Highland forex scheme.  Second, Counts II-V assert that Davis, Howard, and
Burgos – through their control of or association with the Defaulting Entities –
violated CEA and Dodd-Frank Act registration requirements effective October 19,
2010.

Based on the record submitted and the applicable case law, the Court finds
that Burgos fails to raise a triable issue as to any count alleged against him (Counts
I, II, and III).  Davis and Howard do raise triable issues as to the scienter element
of fraud count (Count I) and Control Person liability for failure to register (Counts II
and IV), but they raise no triable issue as to the misstatement / omission and

30

materiality elements of Count I, or their failure to register as Associated Persons (Counts III and V). The Court analyzes each count below.

### a. Count I: Fraud in Connection with Forex

The CFTC first alleges that all three defendants violated § 4(b) of the CEA, which prohibits fraud in connection with forex transactions. The core of this claim is that Davis and Howard fraudulently induced retail customers to open managed accounts that Burgos would trade. They are alleged to have done so by showing falsified performance charts and making exaggerated sales pitches to prospective customers, holding Burgos out to be a successful forex trader when, in fact, he consistently lost money. The CFTC alleges that Davis and Howard had actual knowledge – or were reckless in failing to investigate – that Burgos had provided false performance data.

To prove a violation of §§ 4b(a)(2)(A)-(C) of the CEA, the CFTC must prove that defendants (1) made misrepresentations or factual omissions; (2) that were material to the investor's decision to invest; and (3) that defendants acted with scienter.  7 U.S.C. §§ 6b(a)(2)(A)-(C); see also CFTC v. AVCO Fin. Corp., 28 F. Supp. 2d 104, 115 (S.D.N.Y. 1998) (citing Saxe v. E.F. Hutton & Co., Inc., 789 F. 2d 105, 109 (2d Cir. 1986)).

The scienter requirement necessitates a showing that defendants had "intent to deceive, manipulate, or defraud." See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). In the Second Circuit, scienter may be satisfied by showing defendants had actual knowledge that the material statements they made were false, or that

31

they were reckless in failing to discover their falsity.  See Novak v. Kasaks, et al.,
216 F. 3d 300, 308 (2d Cir. 2000).  Recklessness is defined as, "at the least, conduct
which is 'highly unreasonable' and which represents 'an extreme departure from the
standards of ordinary care . . . to the extent that the danger was either known to the
defendant or so obvious that the defendant must have been aware of it.'" Id. (citing
Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F. 2d 38, 47 (2d Cir. 1978)).

        Before trial, however, "[t]he Second Circuit has repeatedly held that where
subjective issues regarding intent, motive or state of mind are implicated, summary
judgment is usually inappropriate." See, e.g., Balderman v. United States Veterans
Admin., 870 F.2d 57, 60 (2d Cir.1989); Alvin S. Schwartz, M.S., P.A.
Employer/Employee Profit Sharing Plan v. O'Grady, No. 86 Civ. 4243 (JMC), 1990
WL 156274 (S.D.N.Y. Oct. 12, 1990)(denying summary judgment as to § 4(b) claim
to the extent it relied upon subjective intent of defendant)(citing Balderman, 870
F.2d at 60); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir.1989);
Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir.1984)).

                    i.  Burgos

        Burgos fails to raise a triable issue as to any of the three Section 4(b)
elements – that he (1) made misrepresentations or omissions that (2) were material
to the investors' decisions to invest and (3) he acted with scienter.

        The record is rife with Burgos's undisputed misrepresentations and
omissions.  He first admits that he labeled the Performance Chart data as results
for "HSC Managed Accounts" but that no real accounts existed.  (Burgos 56.1 ¶ 36.)

                                        32

He failed to disclose that fact to Davis, Howard, the Stark and Barclay ratings agencies, or any of the potential investors. Rather, he told Davis that the results were from "actual signal trading." (Id.) He also admitted creating a false IBFX account statement for the $9.5k Account – a "hypothetical" account that did not exist. (Id. at 433-34.) Finally – and perhaps most important – Burgos admits that he falsified the two letters from accountant Paneque that stated Highland's returns had been "reviewed and verified"; they had not.

In addition, the record is uncontested that the misrepresentations were material to prospective customers' investment decisions. The Forex Capital Entities sales agent, Nora Matti, testified that "[t]he whole selling point was that Joe's track record was unparalleled . . . ." (Matti Dep. at 106:8-10.) Investors David Todnem, Kurtis Kludt, Jason Sunderland, and Stephen Dubin all cited Burgos's trading history as supporting their decisions to invest. Burgos does not cite any evidence to contest materiality of the misstatements and omissions outlined above.

Finally, the evidence indisputably reveals that Burgos acted with scienter. He admits he intentionally altered the Paneque letter for the purpose of obtaining the Barclay ranking; the sole purpose of that ranking was to induce more investment in Highland. He told Stark's Campos-Gutierrez that the hypothetical data he submitted for ranking purposes "all looks accurate". His admitted failure to disclose that the Performance Chart data was sourced from hypothetical accounts is, at best, reckless – especially in consideration of the fact that he had used a

"hypothetical investment" disclaimer in his prior business and thus was aware of the danger that investors would mistake his "demo" accounts for real accounts.

Burgos's only defense – asserted without citation to record evidence – is that he could not have intended to fraudulently induce potential investors to invest because the Performance Chart was not posted on the Highland website for the purpose of soliciting customers. Even if that were the case, it is of no moment. Burgos admits that he knew that the Forex Capital Entities used the Performance Chart to solicit customers but never told any Forex Capital Entities officers that the accounts were not real. (Burgos 56.1 ¶ 36.) He alleges that he asked Davis and Howard to "stop sending out" the data, yet he also admits that he continued to update the data for use on the Highland and Forex Capital Entities websites.

As Burgos fails to raise a triable issue as to § 4(b) liability, the CFTC is entitled to summary judgment as to that count.

### ii.  Davis and Howard

Davis and Howard are another matter.  Davis and Howard do not contest that they and the Forex Capital Entities made many of the same misrepresentations and omissions outlined above, or that those statements were material.  However, Davis and Howard consistently argue that they were duped by Burgos.  Whereas Burgos largely admits to engaging in intentional fraud and deception, Davis and Howard make no such admissions.  Scienter is thus the sole contested issue.  Davis and Howard raise issues of fact the resolution of which turns

34

on their credibility. Summary judgment is therefore, with respect to scienter, inappropriate as to Davis and Howard on Count I.

The CFTC's argument in support of summary judgment is premised on the assumption that Davis and Howard, individually or as the responsible part-owners of the Forex Capital Entities, either knew that Burgos's data was falsified or ignored red flags that should have prompted them to investigate. Triable issues exist as to this assumption, however.

The CFTC first alleges that Davis and Howard failed to sufficiently investigate Burgos's profitability claims. Burgos did not provide Davis and Howard with individual account statements to substantiate the numbers in the Highland Performance Chart – and Davis and Howard never asked for those statements. Yet, Davis and Howard repeatedly distributed the Performance Chart to new Forex Capital customers and directed their sales staff to make that data central to their sales pitch. They continued to distribute the Chart even after investors and ratings agencies advised that Burgos had falsified the Paneque accountant verifications and IBFX account statements. According to the CFTC, Howard intentionally misled investors such as Todnem that he would "personally get . . . the written . . . trade record confirmations" from IBFX directly, something he made no effort to do. Finally, Davis and Howard continued to solicit customers in the face of mounting trading losses in their own customers' accounts. They possessed the passwords necessary to track the Highland managed accounts but failed to do so.

Despite the CFTC's assertions, Davis and Howard each testified that they had no knowledge of the Performance Chart data's falsity. They further testified that Burgos told them it represented actual account data; the doctored IBFX statements appeared real and were notarized; and that they believed that the Stark and Barclay agencies conducted their own due diligence and that Burgos's results had therefore been verified. In addition, Burgos admits he did not tell Davis and Howard that the data was hypothetical. Further, Howard argues – and a reasonable juror could agree – that his emails to Todnem merely promised that he would obtain the IBFX confirmations from Highland, not that he would contact IBFX directly to verify the data.

In addition, Davis asserts that she took a number of proactive steps to verify the accuracy of the data; she claims she requested and received trading records from Highland, asked Highland to submit its accounting records (and had no reason to believe they were falsified), performed background checks by contacting Burgos's and Highland's references, relied upon a published book that stated that Joseph Burgos is "one of the greatest traders [the author] has ever met", cooperated with due diligence performed by investors Frank Sunderland and Jason Sunderland – which revealed no red flags, and verified that Burgos had not been the subject complaints to the National Futures Association, Securities and Exchange Commission, or FINRA. (See Interrogatory Responses of Susan Davis, CFTC Reply Br. Ex. B at 16, ECF No. 154.)

The CFTC also argues that scienter is established on the basis that Davis and Howard knew or should have known about widespread losses by Forex Capital Entities customers yet continued to solicit new business. However, triable issues remain as to this contention as well. While the CFTC has put forward evidence that four customers complained to Davis and Howard about losses in their Burgos-traded accounts in late 2009, the CFTC does not present evidence to demonstrate that those losses were sustained, nor does it counter Davis and Howard's assertions that Burgos misled them to believe the losses were a temporary blip. Davis and Howard support their assertions with their emails to Burgos after the losses, which could be read to suggest they believed the veracity of Highland's track record and could not understand why the accounts were failing. Those emails sought immediate explanations of the losses from Burgos, including explanations of his investment strategy. Davis and Howard further claim that Burgos explained away the Paneque incident by blaming his secretary for altering the documents but assured them that an audit had indeed taken place.

Even if Davis and Howard were unaware of Burgos's false historic data, the CFTC alleges that they continued to promote Burgos's success in the face of the customer account losses. Again, Davis and Howard cast doubt as to their intent, however. They testify that, based upon industry practice, as introducing brokers they were not responsible for monitoring the Highland-traded account balances on a frequent basis. While they admit that losses occurred in November 2010, they had little reason to doubt Burgos's well-fabricated record of success. They believed in

Burgos so much that Howard's own family invested with Highland.  In addition, the account summary data on which the CFTC relies to prove widespread losses is incomplete and contains errors.  Davis and Howard state under penalty of perjury that their computer systems failed and they therefore cannot reconstruct the correct charts.  In addition, the summary spreadsheet demonstrating the Forex Capital Entities losses on which the CFTC relies are not primary source documents – rather, they were prepared by a CFTC investigator for the purposes of litigation.  The CFTC did not submit the underlying individual account data for the Court's review, raising hearsay concerns.[12]

Finally, to the extent that the CFTC alleges Davis and Howard were responsible for the statements made by Forex Capital Entities sales staff, it fails to eliminate the issue of Davis and Howard's intent.  The CFTC relies solely on entries made under Davis's name in the sales management software to prove that she directed the sales agents.  Davis counters that those entries bore her name because she had set up the system but that the entries also contained the initials of the Forex Capital Entities supervisory employees who actually directed the staff.  Further, no evidence in the record suggests that Davis or Howard authored the misstatements or omissions in the sales agents' scripts; Howard merely admits that he sometimes edited the scripts generally.

---

[12] Such a report might be admissible at trial if the data on which it is based is available for defendants' review and cross-examination. Fed. R. Evid. 1006. Otherwise, such data is hearsay. In this case, the Court has not received the source data and there is no indication in the record that defendants here have had an opportunity to review or inspect the source data.

Nor does Davis and Howard's response to Burgos's misconduct eliminate the scienter issue. Even under the CFTC's version of events, Davis and Howard parted ways with Burgos by July 2010 – less than one year after Forex Capital Entities executive Kelly learned of the November 2010 Paneque letters. Davis and Howard testified that Burgos repeatedly dodged Forex Capital Entities attempts to obtain an actual audit of Highland, delaying their decision to terminate the relationship.

On this record, triable issues of fact remain as to whether Davis and Howard intended to commit commodities fraud or acted recklessly. Novak, 216 F. 3d at 308. These determinations will rest on credibility assessments that, on these particular facts, are best left for trial.

This conclusion is strengthened by the fact that none of the cases cited by the CFTC in the § 4(b) context made a finding of recklessness-based scienter at the summary judgment stage. See Commodity Futures Trading Comm'n v. Equity Fin. Grp. LLC, 572 F.3d 150, 160 (3d Cir. 2009)(upholding district court's factual findings of scienter following bench trial); In re MRU Holdings Sec. Litig., 769 F. Supp. 2d 500, 517 (S.D.N.Y. 2011)(examining heightened pleading standard on motion to dismiss); Stratte-McClure v. Morgan Stanley, 784 F. Supp. 2d 373, 389 (S.D.N.Y. 2011)(finding plaintiff adequately pled scienter to defeat Rule 12(b)(6) motion).

Therefore, as to Davis and Howard, issues of material fact remain as to scienter; that aspect, and that aspect alone, of the fraud count shall proceed to trial.

b.  Failure to Register Claims

The record is clearer as to Counts II-V – defendants' failure to register in accordance with the CEA, Dodd-Frank Act, and implementing regulations effective October 18, 2010.  Plaintiff is entitled to summary judgment as to these counts, except insofar as it alleges Davis and Howard were Control Persons of the Forex Capital Entities.

i.  Counts II and III: Failure to Register as Commodity Trading Advisors

The CFTC asserts that, as of October 18, 2010, Burgos, Davis, and Howard were required to register with the Commission as Commodity Trading Advisors ("CTAs") but failed to do so.  The Court agrees.

Section 2(c)(2)(C)(iii)(I)(bb) of the CEA, as amended by the CRA, bars persons not registered with the CFTC from exercising discretionary trading authority over any account for or on behalf of any person that is not an ECP (i.e., those investors with less than $10 million in assets or less than $5 million where the purpose of the investment is risk management) in connection with off-exchange forex transactions. 7 U.S.C. § 2(c)(2)(C)(iii)(I)(bb).  The CFTC enacted a regulation ("Part 5") to implement this statute, requiring persons who "exercise[ ] discretionary trading authority or obtain [ ] written authorization to exercise discretionary trading authority" in retail, off-exchange forex trading to register as CTAs beginning October 18, 2010.  17 C.F.R. § 5.1(e)(1)(2011).

40

Individuals related to a CTA entity may be held liable under two theories – as "Control Persons" ("CPs") or "Associated Persons" ("APs") of the CTA.

### 1. Control Person Liability

To be entitled to summary judgment as to CP liability, the CFTC must show there is no triable issue that (1) defendants directly or indirectly controlled the violating entity, and (2) that defendants acted in bad faith or knowingly induced the act or acts constituting the violation. 7 U.S.C.A. § 13c(b); see In re First National Trading Corp., [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,142, at 41,787 (July 20, 1994), aff'd without opinion sub nom. Pick v. CFTC, 99 F.3d 1139 (6th Cir. 1996).

"[T]he issue of control is a determination based upon the totality of the circumstances, including an appraisal of the influence upon management and policies of a corporation by the alleged control person." See CFTC v. AVCO Fin. Corp., 28 F. Supp. 2d 104, 117 (S.D.N.Y. 1998) modified, No. 97 Civ. 3119 (JFK), 1998 WL 524901 (S.D.N.Y. Aug. 21, 1998) and aff'd in part, rev'd in part and remanded sub nom. CFTC v. Vartuli, 228 F.3d 94 (2d Cir. 2000)(citing United States v. Corr, 543 F.2d 1042, 1050 (2d Cir.1976)).

Knowing inducement requires the CFTC to demonstrate that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." CFTC v. Commodity Inv. Grp., Inc., 05-CV-5741 HB, 2007 WL 1519002 (S.D.N.Y. Feb. 27, 2007)(quoting In re Spiegel, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767

(CFTC Jan. 12, 1988)). Deliberately or recklessly avoiding knowledge about
potential wrongdoing cannot absolve a person of control liability; rather,
constructive knowledge is sufficient. Id. (citing JCC, Inc. v. Commodity Futures
Trading Comm'n, 63 F.3d 1557 (11th Cir. 1995)).

### 2. Associated Person Liability

To be held liable as an Associated Person of a CTA, the CFTC must
demonstrate that defendants are natural persons associated with the CTA as
partners, officers, employees, consultants, or agents in any capacity which involves
"[t]he solicitation of a client's or prospective client's discretionary account" or "[t]he
supervision of any person or persons so engaged." 17 C.F.R. § 5.3(a)(3)(ii)(2011).
Acting as an AP of a CTA without registering with the CFTC is a violation of §
2(c)(2)(C)(iii)(I)(aa) . 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa).

### 3. Analysis

All three defendants admit the conduct constituting violations of the CTA
registration requirement.

Burgos raises no triable issue as to CP or AP liability. He admits that he was
the sole and managing member of Highland and held himself out to the public as
such. He controlled Highland's bank and trading accounts. He knowingly caused
the "core activities" that violated the CEA – acting as a discretionary trader of forex
for persons who were not ECPs – after the registration requirement became
effective in October 2010. He admits he never registered with the commission.

While Davis and Howard vigorously contest their classification as CPs, the Court need not reach that issue; they raise no triable issue as to their AP liability. The Forex Capital Entities were CTAs – they obtained written authorization (and in some cases powers of attorney) for Highland to engage in discretionary forex trading activities. Davis and Howard admit that they served as officers and directors of the Forex Capital Entities, that the investors they solicited were not ECPs, and that they never registered with the Commission. Under Section 2(c)(2)(C)(iii)(I)(bb) of the CEA and Part 5 of the Regulations, those undisputed facts are sufficient to impose AP liability.

Thus, plaintiff is entitled to summary judgment against Burgos as to Counts II and III (on both CP and AP theories) and against Davis and Howard as to Count III (AP liability).

### c.  Failure to Register as an Introducing Broker

In Counts IV and V, the CFTC further moves for a finding that Davis and Howard have violated the registration requirement effective October 2010 for "Introducing Brokers" ("IBs") – those who solicit or accept orders for off-exchange forex transactions from non-ECP investors. 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa); 17 C.F.R. § 5.1(f)(1)(2011). As with the CTA counts, Count IV alleges CP liability and Count V alleges AP liability.

Here there is no dispute that after October 10, 2010, the Forex Capital Entities solicited non-ECP investors to place orders for forex transactions with at least two foreign exchange dealers – CCC and Windsor. Davis and Howard admit

that the Forex Capital Entities held themselves out as IBs but were never registered as such.

As with Counts II and III, Howard and Davis fail to raise a triable issue as to their AP liability for the Forex Capital Entities' role as an IB. The definition of an AP of an IB is identical to that of an AP of a CTA. The uncontested evidence demonstrates that Davis and Howard both solicited potential clients (and obtained those clients) to trade off-exchange forex, and that those clients were not ECPs. Therefore, as analyzed above, they remain liable as to Count V and have violated § 2(c)(2)(C)(iii)(I)(aa) of the CEA. Triable issues remain only as to Count IV insofar as Davis and Howard present evidence to contest that they were CPs.

d. Relief

As the Court denies the CFTC's summary judgment motion with respect to the core fraud claim, it will not order permanent injunctive relief, disgorgement, or civil penalties at this time. The Court further finds that material issues of fact remain as to the amount of losses sustained by Highland and the Forex Capital Entities – issues that must be resolved through proof at trial and post-trial penalty submissions.

CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Specifically, plaintiff's motion for summary judgment is granted as to Counts I (fraud in connection with forex), II (failure to register as a CTA) and III (failure to

44

register as an AP of a CTA) with respect to Burgos.  It is further granted as to the material misstatement and materiality aspects of Count I, and the entirety of Counts III (failure to register as an AP of a CTA) and V (failure to register as an AP of an IB) as regards Howard and Davis.

Summary judgment is denied as to the scienter element of Count I, and the entirety of Counts II and IV with respect to Davis and Howard.  Those counts shall proceed to trial.  Further, the Court finds that damages and penalites must be proven and will not be awarded at this time (with respect to Burgos and any other defendant(s) found liable).

The Court's decision does not disturb the default judgments and permanent injunctions entered against Forex Capital Trading Partners, Inc., Forex Capital Trading Group, Inc., and Highland Stone Capital Management, L.L.C.  Likewise, the preliminary injunction entered against all defendants remains in place pending the outcome of trial.

Not later than September 18, 2013, plaintiff shall submit a proposed permanent injunction applicable to Burgos only (the proposed Injunction shall be submitted via electronic mail as PDF and MS Word attachments to ForrestNYSDChambers@nysd.uscourts.gov, copying all defendants).

In addition, the parties shall appear for an in-person status conference at 1:00 p.m., Thursday, October 17, 2013, Courtroom 15A, 500 Pearl St., New York, NY to set dates for further proceedings in this matter.

45

The Clerk of Court is directed to close the motion at ECF No. 106.

SO ORDERED.

Dated:      New York, New York
            August 29, 2013

_____
KATHERINE B. FORREST
United States District Judge

CC:
David Howard (via email)
Defendant Pro Se

Susan Davis (via email)
Defendant Pro Se

Joseph Burgos
Defendant Pro Se
31 East Erie Ave.
Rutherford, NJ 07070