## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | Civil Action No.: 11 CIV 05209 KBF |
| Plaintiff, | Judge Katherine B. Forrest |
| vs. |  |
| HIGHLAND STONE CAPITAL MANAGEMENT, L.L.C., FOREX CAPITAL TRADING GROUP, INC., FOREX CAPITAL TRADING PARTNERS, INC., JOSEPH BURGOS, SUSAN G. DAVIS and DAVID E. HOWARD II | USDC SDNY DOCUMENT ELECTRONICALLY FILED DOC #:_____ DATE FILED FEB 2 6 2014 |
| Defendants. |  |

## CONSENT ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT DAVID E. HOWARD II

### I. INTRODUCTION

On July 27, 2011, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a five-count Complaint against Defendants Highland Stone Capital Management, L.L.C. ("Highland Stone"), Forex Capital Trading Group, Inc. ("Forex Group" or "FCG"), Forex Capital Trading Partners, Inc. ("Forex Partners" or "FCP"), Joseph Burgos ("Burgos"), Susan G. Davis ("Davis") and David E. Howard ("Howard") (collectively "Defendants") seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. §§ 1 et seq. (2012), and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. § 1.1 et seq. (2013).

On April 16, 2012, this Court entered an order for preliminary injunction and other ancillary relief against each of the Defendants. A final order of Default Judgment was entered against Forex Group, Forex Partners and Highland Stone on November 30, 2012. On October 29, 2013, after the CFTC had filed a motion for summary judgment, the Court entered an order of Permanent Injunction against Defendant Burgos. On August 29, 2013, the Court issued an Order that granted in part and denied in part summary judgment against Davis and Howard. Specifically, the Order granted summary judgment as to the material misstatement and materiality aspects of Count I (Fraud in Connection with Forex), the entirety of Count II (Failure to Register as an Associated Person ("AP") of a commodity trading advisor ("CTA") and Count V (Failure to Register as an AP of an introducing broker ("IB") against Davis and Howard. The Court denied summary judgment as to the scienter element only of Count I and the entirety of Counts II (liability as a control person for Failure to Register as a CTA) and IV (liability as a control person for Failure to Register as an IB) with respect to Davis and Howard, ordering that those issues and claims proceed to trial.

## II. CONSENTS AND AGREEMENTS

To effect settlement of the remaining allegations in the Complaint against Defendant David E. Howard, without a trial on the merits or any further judicial proceedings, Defendant David E. Howard:

1.       Consents to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendant David E. Howard II ("Howard Consent Order");

2.       Affirms that he has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the CFTC or any

member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3.      Acknowledges service of the summons and Complaint;

4.      Admits the jurisdiction of this Court over him and the subject matter of this action pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1;

5.      Admits the jurisdiction of the CFTC over the conduct and transactions at issue in this action pursuant to the Act, 7 U.S.C. §§ 1, *et seq.*;

6.      Admits that venue properly lies with this Court pursuant to Section 6c(e) of the Act, as amended, 7 U.S.C. § 13a-1(e);

7.      Waives:

(a) any and all claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. §§ 148.1 *et seq.* (2011), relating to, or arising from, this action;

(b) any and all claims that he may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this action;

(c) any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d) any and all rights of appeal from this action;

8.    Consents to the continued jurisdiction of this Court over him for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendant Howard now or in the future resides outside the jurisdiction of this Court;

9. Agrees that he will not oppose enforcement of this Consent Order by alleging that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waives any objection based thereon;

10.    Agrees that neither he nor any of his agents or employees under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect his: (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the CFTC is not a party.  Defendant Howard shall undertake all steps necessary to ensure that all of his agents and/or employees under his authority or control understand and comply with this agreement; and

11.    By consenting to the entry of this Consent Order, Defendant Howard neither admits nor denies the allegations of the Complaint or the Findings of Fact and Conclusions of Law in this Consent Order, except as to jurisdiction and venue, which he admits.  Further, Defendant Howard agrees and intends that the allegations contained in the Complaint and all of the Findings of Fact and Conclusions of Law contained in this Consent Order shall be taken as true and correct and be given preclusive effect, without further proof, in the course of: (a) any current or subsequent bankruptcy proceeding filed by, on behalf of, or against Defendant Howard;

(b) any proceeding pursuant to Section 8a of the Act, as amended, 7 U.S.C. § 12a, and/or Part 3 of the Regulations, 17 C.F.R. §§ 3.1 *et seq.* (2013); and/or (c) any proceeding to enforce the terms of this Consent Order.

12.    Agrees to provide immediate notice to this Court and the CFTC by certified mail, in the manner required by paragraph 70 of Part VI. of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against him, whether inside or outside the United States, and

13.    Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendant Howard in any other proceeding.

### III.  FINDINGS AND CONCLUSIONS

14.    The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact and Conclusions of Law, a permanent injunction, civil monetary penalty and equitable relief pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**BACKGROUND AND JURISDICTIONAL FACTS**

**A. The Parties To This Consent Order**

15.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, as amended, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2011).

16.     Defendant **David E. Howard II** was the chief executive officer ("CEO"), Director of Sales and Marketing and a Director of Forex Partners. At all relevant times, Howard owned either one-third or one-half of outstanding Forex Partners' stock. From time to time, Howard revised the sales scripts used by Forex Group and Forex Partners' agents to solicit prospective customers. Howard has never been registered in any capacity with the CFTC. However, Howard solicited prospective clients' discretionary trading accounts and supervised persons so engaged, and should have been registered as an AP of a CTA, the Forex Capital Entities. Howard also solicited potential clients and obtained those clients who were not eligible contract participants ("ECPs") to trade off-exchange forex, and should have been registered as an AP of an IB, the Forex Capital Entities.

**B. Other Parties in this Case**

17.     Defendant **Highland Stone Capital Management, LLC** was a New Jersey Limited Liability Company that conducted business at 50 Broad Street- the same location at which Forex Partners sometimes did business. Defendant Burgos was its sole member and it has never been registered with the CFTC in any capacity. However, Highland solicited prospective clients' discretionary trading accounts and supervised persons so engaged and should have been registered as a CTA.

18.     Defendant **Forex Capital Trading Group, Inc.** was a New York corporation that maintained an office at 130 Williams Street, 6th Floor, New York, New York. It was active at the time the CFTC filed this suit, but was never registered with the CFTC in any capacity. However, Forex Group solicited clients' discretionary trading accounts and supervised persons so engaged and should have been registered as a CTA. Forex Group also solicited potential clients and

6

obtained those clients who were not ECPs to trade off-exchange forex, and should have been registered as an IB.

19. Defendant **Forex Capital Trading Partners, Inc.** was a New York corporation whose registered address was the same 130 Williams Street address as Forex Group. Forex Partners also did business at 50 Broad Street, 75 Broad Street, and 44 Wall Street. Forex Partners was never registered with the CFTC in any capacity. Forex Partners and Forex Group operated as a common enterprise and are sometimes referred to herein as the "Forex Capital Entities." However, Forex Partners solicited prospective clients' discretionary trading accounts and supervised persons so engaged and should have been registered as a CTA. Forex Partners also solicited potential clients and obtained those clients who were not ECPs to trade off-exchange forex, and should have been registered as an IB.

20. Defendant **Joe Burgos** was the sole and managing member of Defendant Highland and held himself out to the public as such. He controlled Highland's bank and trading accounts. Burgos has never been registered in any capacity with the CFTC. However, Burgos solicited prospective clients' discretionary trading accounts and supervised persons so engaged and should have been registered as an AP of Highland Stone, a CTA.

21. Defendant **Susan G. Davis**, was President and a director of Forex Group and a signatory on Forex Group's bank accounts. Davis was the President, Secretary and a director of Forex Partners and a signatory on its bank accounts as well. Davis' day to day responsibilities consisted of serving as head of "back office compliance" for the Forex Capital Entities. At all relevant times, Davis owned either one-third or one-half of outstanding Forex Partners stock. Davis registered as an AP of a CTA, Forex Capital Partners, NA, Inc., on May 31, 2011, but was never registered in any other capacity with the CFTC, including in her roles with the Forex

Capital Entities.. However, Davis solicited prospective clients' discretionary trading accounts and supervised persons so engaged and should have been registered as an AP of the Forex Capital Entities, CTAs. Davis also solicited potential clients and obtained those clients who were not ECPs to trade off-exchange forex, and should have been registered as an AP of the Forex Capital Entities, IBs.

### C.  Burgos' Prior Trading History

22.     In 2008, Burgos first opened trading accounts for his firm, Highland, as its "Managing Partner." Between February 2005 and March 2010, Burgos lost most of the funds deposited into his trading accounts.

### D. The Parties Entered Agreements to Introduce Customers and to Trade Forex

23.     In 2009, Davis, Howard and the Forex Capital Entities began to solicit customer accounts.  On April 29, 2009, Davis, on behalf of the Forex Capital Entities, entered into an agreement with City Credit Capital (UK), Ltd. ("CCC"), a foreign exchange ("forex") broker located in the United Kingdom, that began acting in the capacity of a retail foreign exchange dealer ("RFED") after October 18, 2010 to introduce retail forex accounts to CCC in exchange for compensation in the form of per trade rebates, mark-ups and commissions.

24.     On June 14, 2010, Davis and Howard, on behalf of the Forex Capital Entities, entered into an agreement with Windsor Brokers, Ltd. ("Windsor"), a forex broker located in Cyprus, that began acting in the capacity of an RFED after October 18, 2010, to introduce retail forex accounts to Windsor in exchange for compensation in the form of per trade rebates, mark-ups and commissions.

25.     In August 2009, Burgos entered into an agreement with the Forex Capital Entities to be the primary trader of their managed forex accounts through his company, Highland.

## E. Customers Were Solicited to Open Forex Trading Accounts

26.    The Forex Capital Entities, through their sales agents and Davis and Howard, solicited individual customers to open retail accounts at CCC or Windsor via unsolicited calls from purchased lists. The Forex Capital Entities provided a handbook to their sales agents that the sales agents used when making these calls.

27.    Some of the investors who opened accounts signed limited power of attorney ("POA") authorizations to the Forex Capital Entities. Highland and Burgos did not hold a POA to trade any of the customer accounts introduced to CCC or Windsor by the Forex Capital Entities.

## F. Marketing through Burgos' Performance Chart

28.    Burgos did the bulk of the trading for the Forex Capital Entities' customers. In order to execute the customers' trades, Burgos received passwords for the individual customer accounts from the Forex Capital Entities. Burgos traded for the managed customer accounts of the Forex Capital Entities from August 2009 through, approximately, May-June 2011.

29.    The Forex Capital Entities advertised Burgos's experience and skill as a forex trader to prospective customers and its primary marketing tool was its use of a Performance Chart showing a track record of high performance yields for Burgos' managed accounts from the period 2004-2010. The Forex Capital Entities' sales agents attached the Performance Chart to emails to potential customers, and Davis updated the Performance Chart monthly and posted the results to the Forex Capital Entities' websites. Davis and the Forex Capital Entities continued to use the Performance Chart to solicit new customers through July 2011. This Performance Chart was false and did not reflect actual trading data.

## G. The Forex Capital Entities' Customers Suffered Significant Losses

30.      Through these means, between August 2009 and July 2011, the Forex Capital Entities, Davis and Howard successfully solicited 106 retail forex customers who invested $2,868,341.68 in forex accounts at CCC or Windsor that were introduced and managed by the Forex Capital Entities. These customers withdrew $279,302.91 and 103 customers lost $2,417,179.39 through trading in their accounts. Nearly all of the Forex Capital Entities' retail forex customers were from the United States.

31.      In the end, customers lost an aggregate percentage of more than 93% of their overall invested principal amount through forex trading.

32.      During the same 24-month period, from August 2009 until July 2011, customers' accounts had losses in 80% of the months in which trading took place. Further, the losses in the customer accounts often happened within a month or two of the customers opening their accounts.

## H. The Forex Capital Entities Profited from Burgos' Trading for Their Customers

33.      Between August 2009 and July 2011, the Forex Capital Entities earned $407,599.87 for introducing customer accounts to CCC and Windsor.

34.      CCC and Windsor paid the Forex Capital Entities for introducing accounts to them, irrespective of whether or not their customers made money. David and Howard each received a share of the firm's compensation. The Forex Capital Entities paid Highland for its role in managing customer accounts.

## I. Davis and Howard Touted False Profits in the Face of their Customers' Losses

35.      Davis and Howard never told prospective customers about their customers' losses in their Burgos managed accounts at CCC and Windsor for the period from August 2009 through

July 2011. Instead, Davis and Howard continually distributed to prospective customers the false Burgos Performance Chart purporting to show that Burgos, trading through Highland, was successful in his forex trading.

36.     Because Davis and Howard had passwords to their customers' accounts they could access their accounts at any time which would have revealed the losses in those accounts.

37.     Davis and Howard received complaints directly from Forex Capital Entities' customers about the losses in their accounts.

38.     Davis and Howard were parties to a number of internal emails discussing concerns about Burgos' trading losses.

39.     Because Howard wanted to see how Burgos was doing trading for the Forex Capital Entities' customers, Davis calculated the customer account ending balances for the periods ending April and May 2010 and shared it with Howard and Burgos.  Howard did not take any actions when Davis showed him these calculations and Davis did not do this analysis of the accounts again.

40.     Although an audit of Highland's returns as reflected on its Performance Chart was first considered by Davis and the Forex Capital Entities as early as November 2009, an audit was never performed of Highland's performance results.

41.     In November 2010, Highland submitted the Performance Chart to a financial rankings firm in order to rank Highland as a trader. A Forex Capital Entities' employee arranged for Highland to be ranked by the financial rankings firm, and Highland uploaded the Performance Chart to the financial ranking firm's website. Based upon the Performance Chart, Highland was listed for a time as the firm's top trader. The Forex Capital Entities used the firm's rankings of Highland as a top trader, as supported by its false Performance Chart, to solicit

customers. When the financial rankings firm questioned Highland's trading returns, Burgos falsified documents that purported to be from an accountant in a failed attempt to satisfy the firm. Davis and Howard were immediately notified about Burgos' fraudulent act in November 2010 when the accountant discovered it. However, neither Davis nor Howard ever contacted the accountant to determine if he had audited Highland and Burgos' trading results. Although the publisher removed Highland's performance information and its ranking of Highland after Burgos failed to provide an accountant's verification of his results, Davis, Howard and the Forex Capital Entities continued to send out Burgos' trading performance numbers and rankings to prospective customers through at least March 2011. The Forex Capital Entities continued to post Highland's results on its website and did not terminate Burgos as their trader until after Howard had left.

42.     Also in November 2010, Burgos submitted his false Performance Chart results to another financial rankings firm that also began ranking Highland as a top trader. This firm removed Highland's ranking on April 4, 2011, after its representative expressed its concerns that Highland was not registered.

43.     The Forex Capital Entities gave prospective customers false verifications of Highland's past trading account successes and false account statements. In one instance, Howard assured a customer that these false account statements were "100% verified by us and need no outside verification."

44.     As members of the Board of Directors for Forex Partners, Davis and Howard "managed all of the business and affairs of the corporation" and "all corporate powers" were exercised by or under their direction.

45.     Howard supervised persons who solicited customers to open accounts in his role as the Head of Marketing and Sales for the Forex Capital Entities, which included having the

ability to hire and fire the sales agents who solicited customers, editing the sales agents' sales

scripts and giving the sales agents new leads and marketing goals. In his role as the Head of

Marketing and Sales, Howard had a responsibility to ensure that the sales solicitations on behalf

of the Forex Capital Entities were truthful, balanced and fully disclosed the risks of forex

trading.    Howard failed to fulfill these responsibilities.

### IV. Conclusions of Law

46.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, as

amended, 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the CFTC

that any person has engaged, is engaging, or is about to engage in any act or practice constituting

a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder,

the CFTC may bring an action in the proper district court of the United States against such

person to enjoin such act or practice, or to enforce compliance with the Act, or any rule,

regulation or order thereunder.

47.     The CFTC has jurisdiction over the forex solicitations and transactions at issue in

this action pursuant to Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2012)

48.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, as

amended, 7 U.S.C. § 13a-1(e), because the Defendant resides in this jurisdiction and the acts and

practices in violation of the Act occurred within this District.

49.     By the conduct described in paragraphs 1 through 45 above, Defendant Howard

acted recklessly with respect to the solicitation of customers or prospective customers of the

Forex Capital Entities, and thereby cheated and defrauded, or attempted to cheat and defraud,

and deceived, or attempted to deceive, customers or prospective customers, in violation of

Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 4b(a)(2)(A)-(C) (2012).

50.    The Forex Capital Entities, cheated and defrauded, or attempted to cheat and defraud, ad willfully deceived, or attempted to deceive, their customers or prospective customers by, among other things,  recklessly, fraudulently soliciting customers and prospective customers in violation of Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. 6b(a)(2)(A)-(C) (2012).

51.    Howard, among others, controlled the Forex Capital Entities, directly or indirectly, and did not act in good faith in connection with the Forex Capital Entities' conduct set forth in paragraph 50; therefore, pursuant to Section 13(b) of the Act, as amended, 7 U.S.C. § 13c(b), Howard is liable for Forex Group's and Forex Partners' violations of Section 4b(a)(2)(A)-(C).

52.    The Forex Capital Entities' exercised discretionary trading authority over the accounts of customers who were not ECPs in connection with forex transactions while failing to register as CTAs in violation of Section 2(c)(2)(C)(iii)(I)(bb) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(bb) and Regulation 5.3(a)(3)(i), 17 C.F.R. § 5.3(a)(3)(i)(2013).

53     Howard, among others, controlled the Forex Capital Entities, directly or indirectly, recklessly induced the Forex Capital Entities' conduct set forth in paragraph 52; therefore, pursuant to Section 13(b) of the Act, as amended, 7 U.S.C. § 13c(b), Howard is  liable for the Forex Capital Entities'  violations of 2(c)(2)(C)(iii)(I)(bb) of the Act and Regulations 5.3(a)(3)(i).

54.    The Forex Capital Entities solicited orders from non-ECPs in connection with forex transactions and acted as IBs in violation of Section 2(c)(2)(C)(iii)(I)(aa), 7 U.SC. § 2(c)(2)(C)(iii)(I)(aa) and Regulation 5.3(a)(5)(i), , 17 C.F.R. § 5.3(a)(5)(i).

55.    Howard, among others, controlled the Forex Capital Entities, directly or indirectly, and recklessly induced the Forex Capital Entities' conduct set forth in paragraph 54; therefore, pursuant to Section 13(b) of the Act, as amended, 7 U.S.C. § 13c(b), Howard is liable for the Forex Capital Entities'  violations of 2(c)(2)(C)(iii)(I)(aa) of the Act and Regulations 5.3(a)(5)(i).

14

## V. PERMANENT INJUNCTION

### A. Prohibition on Conduct in Violation of the Act

#### IT IS HEREBY ORDERED THAT:

56.     Based upon and in connection with the foregoing conduct, pursuant to Section 6c

of the Act, as amended, 7 U.S.C. § 13a-1, Defendant Howard, his officers, agents, servants,

employees, attorneys and all other persons who are in active concert with him are permanently

restrained, enjoined and prohibited from directly or indirectly or in connection with any order to

make, or the making of, any contract of sale of any commodity for future delivery or swap made,

or to be made, for or on behalf of, or with, any other persons:

a.     cheating or defrauding or attempting to cheat or defraud customers or prospective

customers and willfully deceiving or attempting to deceive customers or prospective customers

by, among other things, knowingly fraudulently soliciting customers and prospective customers,

in violation of Section 4b(a)(2)(A) of the Act, 7 U.S.C. §§ 6b(a)(2)(A);

b.     willfully making or causing to be made to customers or prospective customers any

false report or statement by, among other things, making false statements of profitability or

returns,  in violation of Section 4b(a)(2)(B) of the Act, 7 U.S.C. §§ 6b(a)(2)(B);

c.     willfully deceiving or attempting to deceive any customers or prospective

customers by any means whatsoever in regard to any such order or contract or the disposition or

execution of any such order or contract, or in regard to any act of agency performed with respect

to such order or contract for such persons in violation of Section 4b(a)(2)(C) of the Act, 7 U.S.C.

§§ 6b(a)(2)(C);

d.     engaging, directly or indirectly, in the exercise of discretionary trading authority

or in obtaining written authorization to exercise discretionary trading authority over any account

for or on behalf of any person that is not an eligible contract participant in connection with retail forex transactions without being registered as a commodity trading advisor or an associated person of a commodity trading advisor, in violation of Section 2(c)(2)(C)(iii)(I)(aa) and (bb) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and (bb) and Sections 5.3(a)(3)(i) and (ii) of the Regulations, 17 C.F.R. §§ 5.3(a)(3)(i) and (ii) (2013); and

e.     soliciting customers, directly or indirectly, to open trading accounts without being registered as an introducing broker or an associated person of an introducing broker, in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and Sections 5.3(a)(5)(i) and (ii) of the Regulations, 17 C.F.R. §§ 5.3(a)(5)(i) and (ii) (2013).

**B.     Prohibition on Activities Related to Trading and Registration**

57.     **IT IS FURTHER ORDERED** that Howard is permanently enjoined and prohibited from engaging, directly or indirectly, in:

a.     trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a;

b.     entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R. § 1.3(hh) (2013)) ("commodity options"), swaps (as that term is defined in Section 1a(47) of the Act, as amended, and as further defined by Commission regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx)) ("swaps"), security futures products, foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for his own personal account or for any account in which he has a direct or indirect interest;

c.     having any commodity futures, options on commodity futures, commodity options, swaps, security futures products and/or forex contracts traded on his behalf;

  d.  controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, swaps, security futures products and/or forex contracts;

  e.  soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, swaps, security futures products and/or forex contracts;

  f.  applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013); and/or

  g.  acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)(2013)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013).

## V. RESTITUTION AND CIVIL MONETARY PENALTY

**Restitution**

  58.  **Defendant Howard** shall be liable to pay restitution, to pay restitution in the amount of Four Hundred and Seven Thousand Five-hundred and Ninety-nine dollars and eighty-seven cents ($407,599.87) ("Restitution Obligation"), plus post-judgment interest, within thirty (30) days of the date of the entry of this Consent Order. Howard's liability shall be joint and several with Defendants Davis and Burgos if they are also ordered to pay restitution. Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this

Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961

59.     To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendant Howard's customers, the Court appoints the NFA as Monitor ("Monitor"). The Monitor shall collect restitution payments from Defendant Howard and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

60.     Defendant Howard shall make Restitution Obligation payments under this Consent Order to the Monitor in the name "Defendant Howard – SETTLEMENT Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant Howard and the name and docket number of this proceeding.  Defendant Howard shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581 and shall send copies to Susan Padove, Senior Trial Attorney, Commodity Futures Trading Commission, 525 W. Monroe, Suite 1100, Chicago, Illinois 60661.

61.     The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendant Howard's customers identified by the CFTC or may defer distribution until such time as the Monitor deems appropriate.  In the event that the amount of Restitution Obligation payments to

the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative

cost of making a distribution to eligible customers is impractical, the Monitor may, in its

discretion, treat such restitution payments as civil monetary penalty payments, which the

Monitor shall forward to the CFTC following the instructions for civil monetary penalty

payments set forth in Part V. B.below.

62.    Defendant Howard shall cooperate with the Monitor as appropriate to provide

such information as the Monitor deems necessary and appropriate to identify Defendant's

customers to whom the Monitor, in its sole discretion, may determine to include in any plan for

distribution of any Restitution Obligation payments.  Defendant Howard shall execute any

documents necessary to release funds that she has in any repository, bank, investment or other

financial institution, wherever located, in order to make partial or total payment toward the

Restitution Obligation.

63.    The Monitor shall provide the Commission at the beginning of each calendar year

with a report detailing the disbursement of funds to Defendant Howard's customers during the

previous year.  The Monitor shall transmit this report under a cover letter that identifies the name

and docket number of this proceeding to the Chief Financial Officer, Commodity Futures

Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

64.    The amounts payable to each customer shall not limit the ability of any customer

from proving that a greater amount is owed from Defendant Howard or any other person or

entity, and nothing herein shall be construed in any way to limit or abridge the rights of any

customer that exist under state or common law.

65.    Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of

Defendant Davis who suffered a loss is explicitly made an intended third-party beneficiary of

this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendant Howard to ensure continued compliance with any provision of this Consent Order and to hold Defendant Howard in contempt for any violations of any provision of this Consent Order.

66.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendant Howard's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.     Civil Monetary Penalty**

67.     Defendant Howard shall be jointly and severally liable with Defendants Davis and Burgos to pay a civil monetary penalty of Five-hundred our thousand dollars ($500,000); provided, however, that Howard's individual liability shall not exceed Two-hundred and fifty-thousand dollars ($250,000) ("CMP Obligation"), plus post-judgment interest, which sum is due and payable within thirty (30) days of the date of the entry of this Consent Order. Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2006).

68.     Defendant Howard shall pay his CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables – AMZ 340

> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment by electronic funds transfer is chosen, Defendant Howard shall contact Nikki Gibsonor

her successor at the address above to receive payment instructions and shall fully comply with

those instructions. Defendant Howard shall accompany payment of the CMP Obligation with a

cover letter that identifies Defendant Davis and the name and docket number of this proceeding.

Defendant Howard shall simultaneously transmit copies of the cover letter and the form of

payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three

Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581. A copy shall also be sent to:

Rosemary Hollinger, Deputy Director, 525 W. Monroe Street, Suite 1100, Chicago, Illinois

60661.

**Provisions Related to Monetary Sanctions**

69.     Partial Satisfaction: Any acceptance by the Commission/CFTC or the Monitor of

partial payment of Defendant Howard's Restitution Obligation or CMP Obligation shall not be

deemed a waiver of his obligation to make further payments pursuant to this Consent Order, or a

waiver of the Commission/CFTC's right to seek to compel payment of any remaining balance.

## VI.  MISCELLANEOUS PROVISIONS

70.     Notice: All notices required to be given by any provision in this Consent Order

shall be sent certified mail, return receipt requested, as follows, to the CFTC:

> Rosemary Hollinger
> Deputy Director
> 525 W. Monroe Street
> Suite 1100
> Chicago, Illinois 60661

All notices required to be given by any provision of this Consent Order, as follows, to Defendant David E. Howard II:

david.e.howard@hotmail.com

All such notices to the CFTC shall reference the name and docket number of this action.

71.     Change of Address/Phone: Until such time as Defendant Howard satisfies in full his Restitution Obligation and CMP Obligation as set forth in this Consent Order, Defendant Howard shall provide written notice to the Commission by certified mail of any change to his telephone number and e-mail address within ten (10) calendar days of the change.

72.     Entire Agreement and Amendments: This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

73.     Invalidation: If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

74.     Waiver: The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

22

75.     Acknowledgements:  Upon being served with copies of this Consent Order after
entry by the Court, Defendant Howard shall sign acknowledgements of such service and serve
such acknowledgements on the Court and the Commission within ten (10) calendar days.

76.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this
action to ensure compliance with this Consent Order and for all other purposes related to this
action, including any motion by Defendant Howard to modify or for relief from the terms of this
Consent Order.

77.     Injunctive and Equitable Relief Provisions: The injunctive and equitable relief
provisions of this Consent Order shall be binding upon Defendant Howard, upon any person
under his authority or control, and upon any person who receives actual notice of this Consent Order,
by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert
or participation with Defendant Howard.

78.     Counterparts and Facsimile Execution:  This Consent Order may be executed in
two or more counterparts, all of which shall be considered one and the same agreement and shall
become effective when one or more counterparts have been signed by each of the parties hereto
and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all
parties need not sign the same counterpart.  Any counterpart or other signature to this Consent
Order that is delivered by any means shall be deemed for all purposes as constituting good and
valid execution and delivery by such party of this Consent Order.

79.     Defendant Howard understands that the terms of the Consent Order are
enforceable through contempt proceedings, and that, in any such proceedings he may not
challenge the validity of this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this

*Consent Order for Permanent Injunction, Civil Monetary Penalty and other Equitable Relief*

*against Defendant David E. Howard, II.*

IT IS SO ORDERED on this **26**<sup>th</sup> day of ___February___.

_____
Katherine B. Forrest
UNITED STATES DISTRICT JUDGE

CONSENTED TO AND APPROVED BY:

_____
Defendant David E. Howard, pro se

david.e.howard@hotmail.com

Date: _1/1/14_

_____
Susan B. Padove
Senior Trial Attorney
Commodity Futures Trading Commission
525 W. Monroe Street
Suite 1100
Chicago, Illinois  60661
(312) 596-0544
(312) 596-0714 (facsimile)
spadove@cftc.gov

Date  2-25-14

24